**CITY OF KALAMAZOO,
et al., Plaintiffs,**

v.

**MICHIGAN DISPOSAL SERVICE
CORPORATION, et al.,
Defendants.**

No. 1:99 CV 338.

United States District Court,
W.D. Michigan,
Southern Division.

Dec. 20, 2000.

John A. Ferroli, Dykema Gossett, PLLC, Grand Rapids, MI, Robert H. Cinabro, Office of the City Attorney, Kalamazoo, MI, for Kalamazoo, City of.

John A. Ferroli, Dykema Gossett, PLLC, Grand Rapids, MI, Scott S. Brinkmeyer, Mika, Meyers, Beckett & Jones, PLC, Grand Rapids, MI, for Cork Street Landfill Group.

Gary A. Trepod, Hubbard, Fox, Thomas, White, et al, Lansing, MI, for Michigan Disposal Service Corporation, MDS Liquidating Trust, Dell View Corporation, James J. Dekruyter.

Mark F. Miller, DeNardis, McCandless & Muller, PC, Detroit, MI, for Parker Hannifin Corporation.

Todd R. Dickinson, Tolley, VandenBosch, Walton, Korolewicz & Brengle, P.C., Grand Rapids, MI, for Brunswick Corporation.

Janice N. Pavel, Zevnik, Horton, Guibord, et al., Chicago, IL, for Pneumo Abex Corporation, Pneumo Abex Corporation.

## OPINION

SCOVILLE, United States Magistrate Judge.

### Introduction

Presently before the court is a motion by defendant Brunswick Corporation to disqualify plaintiff's counsel, Dykema Gossett. The asserted ground for disqualification is Dykema Gossett's involvement in litigation previously pending before this court, to which Brunswick was a party, a case which Brunswick asserts is substantially related to the present case. For the reasons set forth below, the court finds that Dykema Gossett, as "common coun-

sel" for the Joint Defense Group in the previous litigation, had a direct attorney-client relationship with the Group members, including Brunswick, and that the firm's representation of plaintiffs in the present case creates a serious conflict of interest. The motion to disqualify will therefore be granted.

This is a civil action for contribution under Section 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613, response cost recovery under Section 20126 of Part 201 of the Natural Resources and Environmental Protection Act ("Part 201"), MICH.COMP.LAWS § 324.20126, for an equitable accounting of the MDS Liquidating Trust, and breach of contract. (Third Amended Complaint, ¶ 1, docket # 37). The lawsuit stems from orders of the United States Environmental Protection Agency ("EPA") ordering remediation of the Cork Street Landfill ("Cork Street"), located in Kalamazoo, Michigan.

The named plaintiffs in this lawsuit are the City of Kalamazoo and an unincorporated association known as the "Cork Street Landfill Group." The members of this association are identified in the complaint as Pharmacia & Upjohn Company, the County of Kalamazoo, and the City of Kalamazoo. (Third Amended Complaint, ¶ 6). The named plaintiffs are represented in this lawsuit by the law firm of Dykema Gossett PLLC ("Dykema Gossett"). The City of Kalamazoo is also represented by Kalamazoo City Attorney Robert H. Cinabro. The Third Amended Complaint identifies attorney Scott Brinkmeyer as Pharmacia & Upjohn's attorney as a member of the Cork Street Landfill Group. Kalamazoo County has not filed an appearance in this lawsuit. No attorney is identified by the complaint as separately representing Kalamazoo County as a member of the Cork Street Landfill Group. Plaintiff's Third Amended Complaint identified ten defendants: Michigan Disposal Service Corporation ("MDS"); MDS Liquidating Trust; Dell View Development Company,

Inc.; James J. Dekruyter; Meijer, Inc.; Brunswick Corporation ("Brunswick"); Pneumo Abex Corporation; Schawk, Inc.; Fabri–Kal Corporation; and Taplin Environmental Contracting Corporation. The last six defendants, including Brunswick, were added to the case in May of 2000.

After the addition of defendants, Judge David W. McKeague held a second Rule 16 scheduling conference on August 21, 2000. Brunswick raised the issue of possible disqualification of Dykema Gossett from representing plaintiffs in this lawsuit based upon Dykema Gossett's prior representation of PRP defendants in connection with the nearby West KL Avenue Landfill site in Kalamazoo, Michigan. Judge McKeague's August 25, 2000 case management order (docket # 67, ¶ 6b) established October 1, 2000, as the deadline for any motions to disqualify Dykema Gossett. On September 29, 2000, defendant Brunswick Corporation filed a timely motion to disqualify Dykema Gossett. (docket # 77). Plaintiffs filed a response brief on October 13, 2000. (docket # 83). On October 13, 2000, defendant MDS filed a brief in support of Brunswick's motion to disqualify Dykema Gossett. (docket # 81). On October 19, 2000, plaintiffs filed a motion to strike MDS's brief in support of Brunswick's motion to disqualify. (docket # 88). The court conducted a hearing on October 20, 2000, on Brunswick's motion to disqualify Dykema Gossett. Brunswick's motion to disqualify Dykema Gossett (docket # 77) will be granted and plaintiff's motion to strike MDS's brief (docket # 88) will be denied.

### Motion to Strike

■ Before addressing the merits of Brunswick's motion to disqualify, the court must first resolve plaintiffs' motion under Fed.R.Civ.P. 12(f) to strike defendant MDS's brief in support of Brunswick's motion. (docket # 88). Motions to strike under Rule 12(f) are generally disfavored. *Federal Savings & Loan Ins. Corp. v. Burdette*, 718 F.Supp. 649, 662 (E.D.Tenn. 1989). A motion to strike under Rule 12(f)

is appropriate only where the pleading asserts an "insufficient defense" or constitutes a "redundant, immaterial, impertinent, or scandalous matter." FED.R.CIV.P. 12(f). MDS's brief does not fall within any of these categories. MDS's brief is simply not a pleading within the meaning of Fed. R.Civ.P. 7(a). Rule 12(f) does not apply.

Plaintiffs' assertion that MDS's brief was filed in violation of the court's case management order by failing to file its brief at an earlier date is meritless. Plaintiffs correctly point out that Judge McKeague's case management order set October 1, 2000, as the deadline for motions to disqualify Dykema Gossett. However, MDS did not file any separate motion to disqualify Dykema Gossett. Rather, on October 13, 2000, MDS filed a brief in reaction to Brunswick's motion, informing the court of its agreement with Brunswick's position. MDS's brief contained minor additional authorities and arguments, but was not supported by any evidence in the form of affidavits or otherwise. MDS's brief was filed a full week before the court's October 20, 2000 hearing on Brunswick's motion. As a party of record in this case, MDS had the right to respond to Brunswick's motion, either positively or negatively. Certainly, the brief of MDS, standing alone, would not warrant disqualification of Dykema Gossett. To uphold the motion to strike, this court would be required to say that only parties opposing a motion may be heard in response. Parties wishing to address the court in support of a request initiated by another party would be relegated to silence. Plaintiffs cite no authority in support of such an extraordinary proposition.

Plaintiffs did not file their motion to strike MDS's brief until October 19, 2000. The motion to strike was hand-delivered to the Clerk's Office, but a copy was not hand-delivered to chambers after the motion was filed. The Clerk's Office is located on a different floor of the Federal Building. Consequently, plaintiffs' motion to strike MDS's brief did not arrive in chambers until approximately halfway through the October 20 hearing on the motion to disqualify. During a break in the hearing, the motion to strike was brought to the court's attention. Plaintiffs' counsel had more than ample opportunity at the October 20 hearing to present other evidence or request additional time within which to respond to MDS's arguments. The court finds no prejudice to plaintiffs in considering the arguments raised and authorities cited in MDS's brief in support of Brunswick's motion to disqualify Dykema Gossett.

The court notes that, if anything, it was the plaintiffs who were technically in violation of the Local Civil Rules. Local Civil Rule 7.1(b) provides that "When allegations of facts not appearing in the record are relied upon in support of or in opposition to any motion, all affidavits or other documents relied upon to establish such facts shall accompany the motion." W.D.MICH.LCIVR 7.1(b). Attorney Ferroli's affidavit in opposition to Brunswick's motion was not submitted in compliance with this rule. The affidavit was filed separately with the court on October 16, 2000, three days after plaintiffs filed their brief in opposition to Brunswick's motion.

In summary, the efforts of MDS to address Brunswick's motion were within its rights as a party litigant and have not resulted in any prejudice to plaintiffs. Plaintiffs' motion to strike Michigan Disposal's brief will be denied.

### Standard for Motion to Disqualify

The Sixth Circuit applies a three-part test for attorney disqualification: (1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification. *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio,* 900 F.2d 882, 889 (6th Cir.1990). When confronted with such a motion, courts must be sensitive to the

competing public policy interests of preserving client confidences and of permitting a party to retain counsel of its choice. *Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222, 224 (6th Cir.1988). The movant has the burden of proving that opposing counsel should be disqualified. *See Bartech Ind., Inc. v. Int'l Baking Co., Inc.,* 910 F.Supp. 388, 392 (E.D.Tenn. 1996). A decision to disqualify counsel must be based on a factual inquiry conducted in a manner which will afford appellate review. *General Mill Supply Co. v. SCA Services, Inc.,* 697 F.2d 704, 710 (6th Cir.1982). Factual findings regarding disqualification are reviewed under a clearly erroneous standard. *Dana Corp.,* 900 F.2d at 889.

### Facts

#### A. West KL Avenue Landfill

The plaintiffs in the prior lawsuit of *Charter Twp. of Oshtemo v. American Cyanamid Co.,* 1:92 cv 843 (W.D.Mich.), were the City of Kalamazoo, Kalamazoo County, Pharmacia & Upjohn Company[1] and the Charter Township of Oshtemo. It was a CERCLA action filed on December 10, 1992. The plaintiffs sought recovery of response costs incurred by them on account of the release or threatened release of hazardous substances from the West KL Avenue Landfill site in Kalamazoo County, Michigan. (*See* copy of Complaint attached as Ex. A to Brunswick's motion). The West KL Avenue site is located approximately seven miles west of downtown Kalamazoo, adjacent to West KL Avenue. In 1968, the county acquired the West KL Avenue site for use as a county-wide sanitary landfill facility. The landfill operations continued until 1979. The West KL Avenue plaintiffs were represented by Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C. (Pharmacia & Upjohn); Mika, Meyers, Beckett & Jones, P.C. (Pharmacia & Upjohn); Duane T. Triemstra (County

of Kalamazoo); Robert H. Cinabro (City of Kalamazoo); and Reed, Stoven & O'Connor, P.C. (Township of Oshtemo). (Ferroli Aff., ¶ 4).

After the complaint was filed, a group of generator defendants named as potentially responsible parties (PRPs) formed the West KL Avenue Joint Defense Group ("Joint Defense Group"). The Joint Defense Group consisted of seventeen corporate defendants alleged to have been generators of hazardous substances found at the site. (Ferroli Aff., ¶ 5). Corporations became "Members" of the "Joint Defense Group" by signing the Joint Defense Agreement. (docket # 77, Ex. B). Dykema Gossett represented General Motors when General Motors signed the Joint Defense Agreement in April of 1993. Attorneys John A. Ferroli and Scott D. Broekstra were attorneys employed at Dykema Gossett during this period. It is undisputed that Brunswick Corporation also signed the Joint Defense Agreement and became a Member of the Group. Attorney Todd R. Dickinson represented Brunswick. (Dickinson Aff., ¶ 4; Ferroli Aff. ¶ 5).

The primary purpose of the Joint Defense Group was to pool resources of similarly situated generator defendants in the West KL Avenue litigation for defense activities common to all defendants. These common defense activities primarily related to analysis and discovery of the West KL Avenue plaintiffs' waste streams, hiring common experts, and mounting a common defense to the West KL plaintiffs' claims for response costs under CERCLA. (Ferroli Aff., ¶ 6). The Joint Defense Agreement authorized the Group to retain common counsel and to form committees. Persons serving committee assignments on behalf of Members agreed to maintain the privileged nature and confidentiality of all communications and proceedings of such committees.

---

1. Upjohn merged with Pharmacia in 1995. The name of the combined company is used throughout this opinion.

3.1 *Committees*. In order to carry out the purposes of this Agreement, the Group may establish a Steering Committee, or other Committees as deemed necessary and appropriate to carry out Group responsibilities under this Agreement. Each Member, and any individual serving on any Committee on behalf of any Member, agrees, by virtue of such service, to maintain the privileged nature and confidentiality of all communications and proceedings of such Committees; such obligation shall continue in the event such individual should leave the employ of or cease to represent such Member, and in the event such Member withdraws from the Group.

\* \* \* \* \* \*

3.9 *Exclusive Authority*. The Group shall retain the exclusive authority to authorize the retention by the Group of legal counsel and consultants to perform specified activities on behalf of the Group.

\* \* \* \* \* \*

4.1 *Enumerated Powers*. The powers, duties and responsibilities of the Group shall include:

(a) retaining, coordinating, supervising and directing the activities of common counsel, if common counsel is deemed necessary and approved by the Group.

The Joint Defense Agreement allowed Members of the Joint Defense Group to retain separate counsel on any matter and "opt out" of representation by common counsel upon any matter.

4.4 *Right of Separate Counsel*. Notwithstanding that common counsel may be retained with respect to any matter, each Member reserves the right to select and retain its own counsel to represent such Member on any matter, and to advise common counsel that such Member is not to be represented by or through common counsel with respect to any such matter.

The Joint Defense Agreement expressly stated that mere service by an attorney on a committee or subcommittee was not intended to create an attorney/client relationship with Members of the group. By contrast, the Joint Defense Agreement did not contain any statement that *common counsel* was not intended to have an attorney-client relationship with Members of the Joint Defense Group.

14. *RELATIONSHIP OF MEMBERS*.

No member, or representative, or counsel for any Member, has acted as counsel for any other Member with respect to such Member entering into this Agreement, except as expressly engaged by such Member with respect to this Agreement, and each Member represents that it has sought and obtained any appropriate legal advice it deems necessary prior to entering into this Agreement.

No Member or its representative serving on any committee or subcommittee shall act or be deemed to act as legal counsel or a representative of any other [M]ember, unless expressly retained by such Member for such purpose, and, except for such express retention, no attorney/client relationship is intended to be created between representatives on any committee or subcommittee and the Members.

Nothing herein shall be deemed to create a partnership or joint venture and/or principal and agent relationship between or among the Members.

Paragraph 7 of the Joint Defense Agreement waived specified conflicts of interest that common counsel would otherwise incur as a consequence of acting on behalf of all group Members:

7. *WAIVER OF CONFLICT OF INTEREST*.

If the Group engages common counsel, consultants or experts, or otherwise assigns a task to a Member or Members to be funded as a Shared Cost (collec-

tively, "Representatives"), each Member agrees that: (1) it will not claim or assert that, based solely on said Representative's past or present representation of a Member, said Representative has a conflict of interest in performing services authorized by the Group and arising out of the West KL Avenue Landfill Site, unless the Member notifies the Group of the claimed conflict within twenty (20) days of receiving notice of intent to hire said Representative; (2) it will not claim or assert that, based solely on said Representative's representation of the Group under the terms of this Agreement, said Representative has a conflict of interest in connection with any representation of any other person or entity in a matter pending as of the date of receiving notice of intent to hire said Representative, unless the Member notifies the Group of the claimed conflict within twenty (20) days of receiving said notice; (3) it will not claim or assert that, based solely on said Representative's representation of the Group under the terms of this Agreement, said Representative has a conflict of interest in any future representation of any person or entity *unless the subject matter relating to said representation arises out of or is connected to the West KL Avenue Landfill Site or involves or could involve any facts or information obtained from the Member during the term of this Agreement;* (4) in the event that any conflict develops in the performance of work authorized by the Group or by any Representative and the performance of work authorized by a Member that has retained that Representative, the Member consents to said Representative's continued performance of the work authorized by the Group; and (5) if a Member withdraws or is removed from this Agreement or its representation by any Representative is in any way terminated, it will raise no objection to the continued representation by such Representative of all or any of the other Members in connection with any services arising out of the West KL Avenue Landfill Site.

(emphasis added).

The Joint Defense Agreement contained an extremely lengthy series of confidentiality provisions. Members were expected to exchange information as a part of the joint defense effort, and that shared information would be kept confidential and not disclosed to non-Members except under specified circumstances.

9. *CONFIDENTIALITY AND USE OF INFORMATION.*

9.1. *Shared Information.* From time to time, the Members may elect to disclose or transmit to each other, such information as each Member or technical consultant retained for the Group deems appropriate for the sole and limited purpose of asserting any common claims or defenses relating to the West KL Avenue Landfill Site and coordinating such other activities that are necessary and proper to carry out the purposes of this Agreement. Shared information may be disclosed to or transferred among the Members orally or in writing or by any other appropriate means of communications. The Members intend that no claim of work product privilege or other privilege be waived by reason of participation or cooperation in the common response to, or defense of, any claims arising out of the West KL Avenue Landfill Site.

9.2 *Preservation of Privilege.* Information disclosed by the Members to the Group, or to common counsel if retained, may be disclosed to any other Member, and each Member hereby expressly consents to treat such disclosure to it as being for the sole purpose of asserting any common claims, responses or defenses arising out of the West KL Avenue Landfill Site. Such disclosure shall not be deemed a waiver of the attorney-client privilege or work product immunity or any other privilege.

9.3 *Confidentiality of Shared Information.*

(a) Each Member agrees that all shared information received from any other Member or its counsel, or technical consultant retained for the Group pursuant to this Agreement, shall be held in strict confidence by the receiving Member and by all persons to whom such confidential information is revealed by the receiving Member, pursuant to this Agreement, and that such information shall be used only in connection with asserting any common claims, responses or defenses in connection with the West KL Avenue Landfill Site and conducting such other activities that are necessary and proper to carry out the purposes of this Agreement;

(b) Shared information that is exchanged in written or in document form and is intended to be kept confidential may, but need not, be marked "Confidential" or with a similar legend. If such information becomes the subject of an administrative or judicial order requiring disclosure of such information by a Member, where the information will be unprotected by confidentiality obligations, the Member may satisfy its confidentiality obligations hereunder by notifying the Member that generated the information and by giving such Member an opportunity to protect the confidentiality of the information or, if the information was generated by common counsel or a technical consultant, by giving notice to common counsel or the technical consultant, of the required disclosure;

(c) Each Member shall take all necessary and appropriate measures to ensure that any person who is granted access to any shared information or who participates in work on common projects or who otherwise assists any counsel or technical consultant in connection with this Agreement, is familiar with the terms of this Agreement and complies with such terms as they relate to the duties of such person;

(d) The Members intend by this Section to protect from disclosure all information and documents shared among any Members or between any Member and common counsel or any technical consultant to the greatest extent permitted by law regardless of whether the sharing occurred before execution of this Agreement and regardless of whether the writing or document is marked "Confidential";

(e) The confidentiality obligations of the Members under this Section shall remain in full force and effect, without regard to whether a Member withdraws or is removed, whether this Agreement is terminated or whether any action arising out of the West KL Avenue Landfill Site is terminated by final judgment or settlement. The provisions of this Section shall not apply to information which is now or hereafter becomes public knowledge without violation of this Agreement, or which is sought and obtained from a Member pursuant to applicable discovery procedures and not otherwise protected from disclosure; and

(f) If a Member withdraws from this Agreement pursuant to Section 6.1 or is removed pursuant to Section 6.2, any documents or other physical materials containing confidential information provided by such Member to common counsel, to the other Members, or to any technical consultant retained for the Group, shall, upon written request of the withdrawing or removed Member, be promptly returned to such Member together with all copies thereof, and any document or physical mate-

rials provided any technical consultant, or the other Members to the withdrawing or removed Member shall be promptly returned by such member together with all copies thereof. The withdrawing or removed Member and the remaining Members shall remain obligated to preserve the confidentiality of all confidential information received or disclosed pursuant to this Agreement. In the event this Agreement is terminated, the Members shall return such documents or physical materials to other Members in the same manner as if a Member had withdrawn and all Members shall remain obligated to preserve the confidentiality of all confidential information received or disclosed pursuant to this Agreement.

The Joint Defense Group and the various committees organized under the Agreement briefed and argued motions, hired experts, conducted depositions, propounded interrogatories and document requests, interviewed potential witnesses, and reviewed, summarized and indexed documents. (Dickinson Aff., ¶ 9).

In order to coordinate the activities of the Joint Defense Group, lawyers representing the individual members of the Joint Defense Group participated in numerous meetings. According to attorney Dickinson, at these meetings they shared confidential information, including mental impressions and assessments of the evidence, and developed a common defense strategy. (Dickinson Aff., ¶ 9). According to Dickinson's affidavit, between the meetings, a considerable amount of confidential information was exchanged orally and in writing between Members of the Joint Defense Group and their attorneys. (*Id.*). In his affidavit, Dykema Gossett attorney Scott Broekstra concedes that the discussions at these meetings involved common litigation strategy, including "mental impressions and assessment of the evidence," "discussions related to expert witnesses,"

and "the development of a common defense strategy." (Broekstra Aff., ¶ 8). Nevertheless, Broekstra at the same time maintains that no confidential information was discussed. (*Id.*).

The activities of the Joint Defense Group were significant in scope. The group existed for four years and expended over $1.9 million in defense of the claims in the *Oshtemo Township* case. These funds were paid into a trust fund by the defendant group members and expended for common counsel, expert witnesses, investigation costs, court reporters, and other litigation expenses of the law firms engaged as common counsel. Dykema Gossett played by far the most central role.

Dykema Gossett acknowledges performing the following sixteen assignments as common counsel:

(1) Drafting response to motion for summary judgment on common issues;

(2) Taking depositions of West KL operators and employees and drafting deposition summaries;

(3) Drafting position paper regarding global settlement offer to the West KL plaintiffs;

(4) Drafting response to plaintiff's regarding Upjohn waste volume submittal;

(5) Drafting response to motion to bifurcate trial and discovery;

(6) Conducting legal research and drafting memorandum regarding CERCLA divisibility case law;

(7) Conducting legal research regarding proposed separable costs (landfill capping costs related to Michigan's Act 87 and Act 641)

(8) Working with Dr. Staab, the Group's expert with respect to Upjohn's waste stream, related to editing and filing expert disclosure reports;

(9) Drafting responses to the West KL plaintiff's interrogatories regarding general divisibility issues (sample

generic responses related to divisibility issues were provided to each Group member after adapting it for the member's fact situation);

(10) Drafting various discovery requests to the West KL Plaintiffs

(11) Taking depositions of the West KL plaintiffs' consultants Geraghty & Miller and Golder Associates;

(12) Taking Rule 30(b)(6) depositions of City, County and Township witnesses regarding response costs;

(13) Taking Rule 30(b)(6) deposition of the Upjohn Company regarding response costs and the West KL plaintiff's attorney's fees;

(14) Drafting arbitration submissions/reply brief on common issues;

(15) Drafting motion for summary judgment against the West KL plaintiffs relating to attorneys fees and response costs; and

(16) Drafting motion for summary judgment against West KL plaintiffs on issue of liability.

(Ferroli Aff., ¶ 19). Dykema Gossett's invoices were issued to the Joint Defense Group, and the firm was paid from the Joint Defense Group trust fund. (Ferroli Aff., ¶¶ 17–19; Dickinson Aff., ¶ 11). Dykema Gossett received payment of approximately $330,000 for work it performed as common counsel. The records of the Joint Defense Group were maintained for a time at the offices of the Varnum, Riddering law firm, but ultimately were transferred to Dykema Gossett. At oral argument, it was represented to the court without contradiction that Dykema Gossett *still* maintains the records of the defendants in the *Oshtemo Township* case, to this day.

A recurring issue that the Joint Defense Group had to address was how to equitably apportion the assessments levied upon its members. Numerous approaches were considered and rejected. The formula ultimately used for most assessments was the product of a negotiated compromise. Ac-

cording to attorney Dickinson, of particular significance to the instant motion were the activities of the Allocation Committee, formed in 1994. The West KL Avenue plaintiffs had developed and disclosed their own estimates of the waste volumes attributable to each defendant. Among defendants these volume estimates were believed to be unreliable. The West KL plaintiffs took the position that each defendant could be held jointly and severally liable for all response costs incurred by plaintiffs, and that any defendant that wished to settle on the basis of a waste volume estimate lower than plaintiffs' estimate bore a heavy burden of justifying an alternative figure. The Allocation Committee, consisting of three attorneys representing Joint Defense Group Members, undertook to review all the evidence pertaining to waste volume, and to develop its own estimates of waste volume attributable to each Member, purely for internal use in developing an equitable cost-sharing formula. The results of this undertaking were summarized in a chart distributed to representatives of all Members. (Dickinson Aff., ¶ 12).

The Joint Defense Group devoted considerable effort to developing and analyzing evidence relating to the volume and character of the waste attributable to Upjohn, the City of Kalamazoo, and Kalamazoo County, all of whom were named plaintiffs in the lawsuit against Members of the Joint Defense Group. (Dickinson Aff., ¶ 13). Hundreds of hours of work were performed by attorneys and consultants paid by the Joint Defense Group to try to prove that the *Oshtemo Township* plaintiffs, and particularly Upjohn, were underestimating both the volume and the toxic character of their own waste in an attempt to exaggerate the equitable share attributable to defendants. This effort involved sifting and weighing evidence, considering and rejecting possible arguments, from both a legal and technical standpoint. (Dickinson Aff., ¶ 13). The fruits of this effort were ultimately advanced as the

Joint Defense Group's position in the litigation, and thus were communicated to plaintiffs, at least to some extent. (*See, e.g.*, docket # 77, Ex. E, May 10, 1995 Ferroli letter to Martha Koster, submitted separately under seal). According to attorney Dickinson, "it was never intended that the preliminary drafts and 'rough cuts' of this analysis would be available to attorneys who would one day be able to use them against Joint Defense Group Members in CERCLA litigation involving a Superfund Site just a few miles away from the West KL Avenue Landfill Site." (Dickinson Aff., ¶ 13).

Attorney Broekstra's affidavit acknowledges that during Joint Defense Group activities, he had discussions with Brunswick's attorney, Todd Dickinson. He did not have conversations with other employees, agents or representatives of Brunswick. (Broekstra Aff., ¶ 5). Attorney Broekstra was present at Joint Defense Group meetings. (Broekstra Aff., ¶ 8). During the Joint Defense Group meetings, "discussions involved general litigation strategy related to all Joint Defense Group members' common defense, including 'mental impressions and assessments of the evidence' and the 'development of a common defense strategy,' as well as discussions related to expert witnesses retained by the Joint Defense Group." (Broekstra Aff., ¶ 8). Broekstra was not involved in Allocation Committee discussions or activities. (Broekstra Aff., ¶ 7).

Attorney Ferroli's affidavit acknowledges his participation in Joint Defense Group meetings. Likewise, Ferroli's contacts were with Dickinson rather than with Brunswick employees or other agents. (Ferroli Aff., ¶¶ 13, 14). At the Joint Defense Group meetings Ferroli attended,

the type of information discussed related to general litigation strategy in connection with the issues common to all defendants, such as the volume, nature and toxicity of the plaintiffs' waste and common defenses available to Joint Defense Group Members to the plaintiffs' claims for response costs. (Ferroli Aff., ¶ 13).

Dykema Gossett acknowledges that it received three versions of waste process summary charts from the Joint Defense Group Allocation Committee. (docket # 83, Ex. C, Ferroli Aff., ¶ 11). Dykema Gossett filed separately under seal (docket # 83, Ex. C)[2] a May 19, 1994 letter addressed to Joint Defense Group Members. Enclosed with the letter was a memorandum summarizing the Joint Defense Group's May 4, 1994 meeting. Also attached was "a proposed allocation scheme, as determined at that meeting," and a ballot for the Members' approval of the allocation proposal. The allocation proposal is marked as confidential and "intended only for the use of the addressee."

The court's docket sheet in case no. 1:92cv 843 shows that West KL Avenue plaintiffs and defendants were subject to discovery in the earlier lawsuit. (*See also* Ferroli Aff., ¶ 10). Dykema Gossett has attached to its brief what appear to be exhibits from the deposition of Brunswick's expert witness Mark Groenleer, at his March 25, 1996 deposition, in that case. (Ferroli Aff., ¶ 15).[3]

Counsel for each individual Member of the Joint Defense Group handled all matters related to the litigation that were "specific to his/her client," including responsive pleadings, document production, responding to discovery and admission requests, discovery motions and defending

---

2. Paragraph 11 of attorney Ferroli's affidavit refers to Exhibit B rather than Exhibit C. Exhibit C was submitted under seal. The typographical error in the cross-reference is obvious, and the court interprets paragraph 11 of Ferroli's affidavit as referring to Exhibit C.

3. Paragraph 15 of Attorney Ferroli's affidavit refers to Exhibit D, which is a copy of the case management order in case no. 1:92cv843. This appears to be another typographical error. The brief refers to Groenleer exhibits as Exhibit B. The court interprets paragraph 15 of Ferroli's affidavit as referencing Exhibit B rather than Exhibit D.

depositions of his/her client's employees. (Ferroli Aff., ¶ 8). Dykema Gossett as common counsel, among other things, drafted responses to the plaintiffs' interrogatories regarding general divisibility issues and provided sample generic responses to each Joint Defense Group Member for use by that member after adapting it to the Member's fact situation. Dykema Gossett as common counsel drafted discovery requests to the plaintiffs, took the depositions of plaintiffs' consultants, took the Rule 30(b)(6) depositions of the City, County, Upjohn, and Township regarding response costs.

On November 6, 1997, pursuant to a stipulation and order between the parties, Chief Judge Richard A. Enslen dismissed the West KL Avenue lawsuit.

### B. Cork Street Landfill

The Cork Street Landfill site (also known as MDS site) is located in Kalamazoo, Michigan. The site consists of approximately 68 acres and was used as a municipal landfill between approximately 1925 to 1968. The City of Kalamazoo purchased the Cork Street property in 1961. The City operated the site as a landfill until 1968, when the West KL Avenue Landfill opened. Following the 1968 closure of the Cork Street Landfill for public use, the City continued to dispose of waste at the Cork Street site until 1981. (Third Amended Complaint, ¶¶ 17–20).

The West KL Avenue Landfill is accurately characterized as the successor landfill to the Cork Street site. From the allegations of plaintiff's present complaint, the West KL Avenue litigation record, and the deposition transcript excerpts produced as an exhibit by plaintiffs (docket # 83, Ex. F), overlap is apparent in the generators purportedly disposing of hazardous substances at these two Kalamazoo area landfills. In practical terms, the West KL Avenue Landfill was the successor to the Cork Street Landfill, in that West KL opened immediately after Cork Street closed and began accepting waste from virtually the same group of generators and transporters.

With regard to Brunswick, the evidence pertaining to the two landfills overlaps extensively. As was true for the other contributors to these landfills, the industrial processes generating the waste were identical for each site. Brunswick's waste was hauled to each site by Industrial Waste Disposal (IWD). Herman Koenes, an employee of IWD, testified in the *Oshtemo Township* case that "the day Cork Street closed, KL opened," and waste formerly hauled to the one was merely redirected to the other.

It is patent that the evidence generated in the West KL Landfill litigation is not only substantially related, but is directly relevant, to the issues in the present case. This conclusion is highlighted by the letter sent to Brunswick and other putative defendants by Dykema Gossett (their former common counsel) before this suit was filed. The letter demands that the putative defendants contribute to the remediation of the Cork Street site, and for support it referred to deposition transcripts generated in the West KL case. At oral argument on the present motion, counsel for Dykema Gossett was frank to admit that there is "no doubt about" the conclusion that evidence regarding one landfill is material to the other. Except for relevant time frames, the two cases pose similar issues and rely upon overlapping evidence.

The Cork Street site was "made final" on the National Priorities List (NPL) in February of 1990. Before that, in December of 1987, the City and MDS entered into an Administrative Consent Order with the U.S. EPA to perform a Remedial Investigation and Feasibility Study ("RI/FS") at the site. The U.S. EPA issued its Record of Decision ("ROD") for the site on September 30, 1991. Major components of the remedy selected in the ROD include: (1) construction of a landfill cap; (2) ground water extraction and treatment; (e) deed restrictions to control

the use of the property and ground water; and (4) site fencing and warning signs to restrict access. On September 12, 1996, the City, County, and Pharmacia & Upjohn entered into a second administrative order of consent with the U.S. EPA which required the performance of certain investigatory activities prior to the development of a design for the remedial action selected in the ROD. Work required under the 1996 agreement was conducted and funded by MDS pursuant to a January 12, 1995 agreement between Pharmacia & Upjohn and MDS. On or about May 14, 1998, the U.S. EPA issued to the City and MDS a Unilateral Administrative Order ("UAO") pursuant to section 106 of CERCLA, 42 U.S.C. § 9606, which ordered the City and MDS to implement, jointly and severally, the landfill cap portion of the remedy selected in the ROD. Plaintiffs estimate the cost of the landfill cap alone at approximately $10 million. (Third Amended Complaint, ¶¶ 22–28). On May 5, 1999, the City of Kalamazoo and the unincorporated association known as the Cork Street Landfill Group filed this lawsuit.

Dykema Gossett's affidavits from attorneys Ferroli and Broekstra fail to establish when Dykema Gossett began representing the City of Kalamazoo or the Cork Street Landfill Group with regard to the Cork Street site. The affidavits do not identify the date of formation, nor any rules of organization or operation of the Cork Street Landfill Group. The closest the attorney's October 2000 affidavits venture into this area is to state that attorneys Ferroli and Broekstra were counsel of record for General Motors in the "now concluded" West KL Avenue lawsuit. (Ferroli Aff., ¶ 3; Broekstra Aff., ¶ 3). The affidavits of attorneys Ferroli and Broekstra do not claim that Brunswick or any other member of the Joint Defense Group other than General Motors has consented to Dykema Gossett's representation of the plaintiffs in this lawsuit.

## *Discussion*

## I. Dykema Gossett's Representation of Defendants in the West KL Avenue Lawsuit

### A. *As Common Counsel, Dykema Gossett Had A Direct Attorney–Client Relationship with Brunswick.*

██ In adjudicating the motion to disqualify, the issues facing the court are (1) whether an attorney-client relationship formerly existed between the attorney and a now adverse party; (2) whether the subject matters of the two cases are "substantially related;" and (3) whether the attorney acquired confidential information from the former client. *See Dana Corp. v. Blue Cross/Blue Shield Mut. of No. Ohio,* 900 F.2d 882, 889 (6th Cir.1990). The attorney-client relationship may be direct or implied. *See Dalrymple v. Nat'l Bank & Trust Co. of Traverse City,* 615 F.Supp. 979, 985 (W.D.Mich.1985). An implied attorney-client relationship may arise when the relationship between the attorney and the other person involves "a fiduciary obligation resulting from 'the nature of the work performed and the circumstances under which the confidential information is divulged.'" *Kaskie v. Celotex Corp.,* 618 F.Supp. 696, 698 (N.D.Ill.1985) (quoting *Westinghouse Elec. Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311, 1320 (7th Cir.1978)). This court is generally guided by the Michigan Rules of Professional Responsibility in assessing such ethical responsibilities. W.D.Mich.LCivR 83.1(j).

Rule 1.9 of the Michigan Rules of Professional Conduct provides as follows:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interest of the former client unless the former client consents after consultation.

\* \* \* \* \* \*

(c) A lawyer who has formerly represented a client in a matter ... shall not thereafter: (1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or (2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

MICHIGAN RULES OF PROF'L CONDUCT R. 1.9.

Rule 1.6 of the state's Rules of Professional Conduct addresses confidentiality of information and limits the circumstances under which confidential or secret information may be disclosed.

Rule 1.6 Confidentiality of Information.

(a) "Confidence" refers to information protected by the client-lawyer privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested to be held inviolate or the disclosure of which would be embarrassing or would likely be detrimental to the client.

(b) Except when permitted under paragraph (c), a lawyer shall not knowingly

(1) reveal a confidence or secret of a client;

(2) use a confidence or secret of a client to the disadvantage of the client; or

(3) use a confidence or secret of a client for the advantage of the lawyer or a third person, unless the client consents after full disclosure.

MICHIGAN RULES OF PROF'L CONDUCT R. 1.6.

Michigan's ethics opinions[4] have addressed the origin of the duties owed to former clients under Rule 1.9.

Rule 1.9 concerns loyalty to a client in cases of *serial* representation; its protections are for the benefit of *former* clients. . . . The idea that lawyers owe duties to ex-clients is neither controversial or novel. It is an outgrowth of the agency law principle that an agent's duties to his principal continue, in reduced scope, after the agency relationship has been terminated. . . . [Once a lawyer has] accepted a client he loses a certain amount of freedom to take on new matters even when the first representation is over. . . . The principle stated in Rule 1.9 is a necessary extension of the client/lawyer relationship, for otherwise a lawyer might terminate the relationship and use the confidential information of his former client to make himself more valuable to a new (and adverse) client.

Michigan Prof'l & Judicial Ethics Comm., Informal Op. RI–46 (1990) (citations omitted). "It is therefore well accepted that the duty of loyalty to the client survives termination of the relationship." *Id.*

■ Dykema Gossett played two distinct roles as counsel for defendants in the West KL Avenue lawsuit: as a representative of one Member of the Joint Defense Group, General Motors, and common counsel for the Joint Defense Group. The court finds that as common counsel Dykema Gossett had a direct attorney-client relationship with Brunswick.

In determining whether the particular facts of a case establish the existence of an attorney-client relationship in a joint defense situation, the federal courts rely heavily on the provisions of any written joint defense agreement establishing the rights and duties of the parties and their counsel. *See, e.g., Essex Chem. Corp. v. Hartford Acc. & Indem. Co.*, 993 F.Supp. 241, 252 (D.N.J.1998); *GTE North, Inc. v.*

---

4. The Supreme Court rules concerning the State Bar of Michigan establish a Board of Commissioners that appoints a standing committee regarding professional and judicial ethics. The committee's ethics opinions are not binding upon courts, but such formal and informal opinions are instructive. *See Barkley v. City of Detroit*, 204 Mich.App. 194, 514 N.W.2d 242, 245–46 (1994).

*Apache Prod. Co.,* 914 F.Supp. 1575, 1577 (N.D.Ill.1996). In the present case, the parties rely on a number of the provisions of the Joint Defense Agreement signed in April of 1993 in connection with the *Oshtemo Township* case. That Agreement makes a clear distinction between counsel who merely represent their respective clients in connection with joint defense activities, on the one hand, and "common counsel" on the other. With regard to those counsel merely participating in joint defense activities on behalf of their respective clients, no attorney-client relationship attaches to any other defendant.

> No Member or its representative serving on any committee or subcommittee shall act or be deemed to act as legal counsel or a representative of any other Member, unless expressly retained by such Member for such purpose, and, except for such express retention, no attorney client relationship is intended to be created between the representatives on any committee or subcommittee and the Members.

(Agreement, § 14, ¶ 2). This is in accord with the majority rule in this country. *See Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 606 (8th Cir.1977), *overruled on other grounds by Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981); *Essex Chemical,* 993 F.Supp. at 252 (collaborative counsel relationship does not render a participating attorney counsel for others); *Turner v. Firestone Tire & Rubber Co.,* 896 F.Supp. 651, 653–54 (E.D.Tex.1995). Consequently, Dykema Gossett's participation in joint defense activities *as attorney for General Motors* did not create a direct attorney-client relationship with Brunswick or any other member of the *Oshtemo* joint defense group, by virtue of § 14, ¶ 12 of the Agreement.[5]

The position of common counsel, by contrast, clearly presumes an attorney-client relationship. Two important observations bear mention at the outset. First, nothing in the Agreement requires that common counsel, if hired, be an attorney already representing one of the defendants. Therefore, the group was free to retain an uninvolved attorney as common counsel. If such an uninvolved attorney had been retained to act as common counsel, it is unlikely that any court would find that common counsel had no professional obligation whatsoever to the very defendants that counsel was representing, perhaps even appearing in court on their behalf. The fact that the common counsel actually chosen also happened to be counsel for General Motors should not, in logic or law, change this result.

Second, the express provisions of § 14, ¶ 2, of the Agreement, which specifically negate the implication of an attorney-client relationship arising from mere participation by counsel in committee work, do not extend this protection to common counsel. If the intent of the parties had been to negate an attorney-client relationship between *common counsel* and the individual Members of the group, that conclusion could have easily been expressed in paragraph 14 by the addition of two or three words. *Expressio unius est exclusio alterius.*

Third, the provisions of the Agreement expressly directed to the issue of waiver of conflict of interest of common counsel presume that a conflict would otherwise exist. Section 7 of the Agreement provides:

> If the Group engages common counsel, consultants or experts, or otherwise assigns a task to a Member or Members to be funded as a Shared Cost (collectively, "Representatives"), each Member

---

5. Dykema Gossett also seeks to rely on the first paragraph of section 14 of the Agreement. The first paragraph of section 14 is a limited provision, and speaks only as of the time at which Members entered into the Agreement. It states, "No member, or representative, or counsel of any Member, has acted as counsel for any other Member with respect to such Member entering into this Agreement ..." This sentence obviously has no application to this dispute.

agrees that ... (3) it will not claim or assert that, based solely on said Representative's representation of the Group under the terms of this Agreement, said Representative has a conflict of interest in any future representation of any person or entity unless the subject matter relating to said representation arises out of or is connected to the West KL Avenue Landfill Site or involves or could involve any facts or information obtained from the Member during the term of this Agreement; ...

This language leaves no doubt that the "Representative" (in this case common counsel) represents the Member. Otherwise, the Members would have no conceivable basis upon which to claim a conflict of interest. This paragraph sets up the standard for disqualification in this instance: a conflict of interest exists unless the subject matter of the future representation is not connected with the West KL Avenue Landfill and no facts or information from the West KL case "could" be involved in the future case. This provision makes it clear that "common counsel" is precisely that: counsel for all Members of the Group.

Contrary to Dykema Gossett's contention, section 4.4 of the Agreement does not undermine this conclusion. Section 4.4 presumes the existence of an attorney-client relationship between common counsel of the Members of the Group. It then provides an express means for Members to opt out of representation by common counsel.

4.4. Right of Separate counsel. Notwithstanding that common counsel may be retained with respect to any matter, each Member reserves the right to select and retain its own counsel to represent such Member on any matter, and to advise common counsel that such Member is not to be represented by or through common counsel with respect to any such matter.

Section 4.4, in other words, presumes that common counsel does indeed represent the Member, who nevertheless "reserves the right" to select its own counsel. Nothing, however, requires the Member to do so. If the Member does not opt for separate counsel, who is its attorney as to that matter? The answer clearly must be "common counsel." There is no evidence that Brunswick ever opted out of common counsel representation with regard to all or any part of Dykema Gossett's services.

■ As noted above, Dykema Gossett lays its greatest reliance on the general rule that there is no attorney-client relationship between counsel for co-defendants in a joint defense situation. *See, e.g., Essex Chemical,* 993 F.Supp. at 252. This general rule is unexceptional, but it does not erect an impregnable barrier against finding an attorney-client relationship in all cases. Numerous authorities recognize that, even where counsel are acting in a joint defense situation on behalf of their own clients, the circumstances of that representation may create an implied attorney-client relationship with co-defendants. *See generally United States v. Henke,* 222 F.3d 633, 637 (9th Cir.2000) ("A joint defense agreement establishes an implied attorney-client relationship with the co-defendant ...").

A fairly recent CERCLA case shows how an attorney operating on behalf of his own client in a joint defense situation may nevertheless create an implied relationship with co-defendants. *GTE North, Inc. v. Apache Prod. Co.,* 914 F.Supp. 1575 (N.D.Ill.1996), arose out of the cleanup of the Belvidere Superfund site in Illinois. Five PRPs formed the Appleton Road Committee and executed the Appleton Agreement. The purposes of the Appleton Agreement were to allocate each member's share of shared response cost, cooperate in investigating and identifying additional PRPs and to pursue cost-recovery activities against any additional PRPs. The Appleton Agreement included confidentiality provisions which provided that all shared information between members and their counsel would be held in strict confidence

by the receiving member and by all persons to whom such confidential information was revealed by the receiving member. The agreement provided that disclosure of such confidential information would not constitute waiver of the attorney-client or work-product privilege. *Id.* at 1577. The Members of the Appleton Committee who had elected to pursue cost recovery, including Chrysler and GTE, entered into a separate Investigation Agreement implementing a joint investigation of additional PRPs who had not participated in the cleanup of the landfill. GTE's counsel, Hinshaw and Culbertson, coordinated the investigation on behalf of GTE and the Cost Recovery Committee. Chrysler was represented during the investigation by Jon S. Faletto of the law firm of Howard & Howard.

Counsel for each member (including Faletto) met on several occasions to discuss strategy for conducting the investigation, the investigation results themselves, the relative merit of proceeding against certain defendants and the legal strategy for bringing the cost recovery action. GTE ultimately filed a CERCLA cost recovery action against Apache Products Company, Dean Foods and others. Attorney Faletto of Howard & Howard appeared on behalf of Dean Foods to defend it in the cost recovery action. GTE moved to disqualify Faletto and his law firm. The court granted GTE's motion to disqualify Faletto and Howard & Howard.

GTE argued that Faletto owed GTE a fiduciary duty to maintain the confidences disclosed during the investigation by virtue of an implied attorney-client relationship. GTE relied upon the confidentiality provisions of the Appleton and Investigation Agreements and the fact that legal strategy was freely communicated between all of the Cost Recovery Committee Members and their attorneys. Faletto and Howard & Howard unsuccessfully argued that any belief held by GTE that Faletto acted as GTE's attorney was unreasonable because GTE was represented by its own counsel.

914 F.Supp. at 1578. The confidentiality provisions of the Appleton Agreement and the Investigation Agreement "clearly establish[ed] an intent that shared information would remain confidential and would remain protected under the attorney-client privilege." 914 F.Supp. at 1581. Faletto, as Chrysler's counsel, received investigation results. Counsel for each member, including Faletto, jointly discussed investigation results, strategy and legal merit of proceeding against additional PRPs, including Dean Foods. *Id.* These facts established that confidential information was exchanged between co-plaintiffs and their respective counsel. "The fact that no officer, shareholder, or employee of GTE (excluding its counsel) ever consulted with Faletto with the expectation that Faletto or any Howard & Howard attorney provided legal representation to GTE [did] not change this conclusion." *Id.* Rules 1.9 and 1.10 of the ABA Model Rules of Professional Conduct prevented Faletto and Howard & Howard from representing Dean Foods. *Accord, Kaskie v. Celotex Corp.*, 618 F.Supp. 696 (N.D.Ill.1985) (exchange of confidential information among counsel for co-defendants under joint defense agreement created implied attorney-client relationship).

The *GTE North* case is significant for several reasons. First, it demonstrates that, even without acting as common counsel, an attorney in a joint defense situation may find an attorney-client relationship arise with co-defendants as the result of sharing confidential information. Second, the case demonstrates that the confidential information may consist of thoughts, mental impressions and strategies regarding a claim against another party. 914 F.Supp. at 1581. Finally, the confidential information may be conveyed by the attorney for the co-defendant, rather than the client itself. Contrary to Dykema Gossett's present contention, it is not required that confidential information pass directly from the client's mouth to the attorney's ears

before the law will accord the information protected status.[6]

The present action presents a far stronger case for disqualification. It is unnecessary for the court to explore the possible existence of an implied attorney-client relationship between Dykema Gossett and the co-defendants in the *Oshtemo Township* case, arising from that firm's joint defense activities on behalf of its client General Motors. By accepting the position of common counsel in that case, the Dykema firm stepped out of its former role of counsel for General Motors only and accepted the responsibility (and the attendant attorney fees) to act on behalf of all Members of the Group. "The rendering of legal advice and legal services by the attorney and the client's reliance on that advice or services is the benchmark of an attorney-client relationship." *Macomb County Taxpayers Ass'n v. L'Anse Creuse Pub. Sch.*, 455 Mich. 1, 564 N.W.2d 457, 462 (1997). In this case, it is indisputable that Dykema Gossett attorneys "performed specific legal services for the Joint Defense Group." (Ferroli Aff., ¶ 17). By doing so, the firm took this case out of the general run of joint defense cases, which analyze the responsibility of an attorney who merely represents his own client in a joint defense situation.

Nor can this court accept Dykema's argument that its only client, as common counsel, was the joint defense group, and not its individual Members. "[A] corporation is the paradidigmatic artificial 'person'." *Carden v. Arkoma Associates*, 494 U.S. 185, 187–88, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990).[7] By contrast, at common law, unincorporated associations were not recognized as separate legal entities.

Such associations had no status distinct from the persons composing them. 494 U.S. at 190, 110 S.Ct. 1015. Because unincorporated associations had no separate legal existence, courts regularly held that attorneys for unincorporated associations had a direct attorney-client relationship with each of the members of the association. *See Halverson v. Convenient Food Mart, Inc.*, 458 F.2d 927, 930 (7th Cir. 1972); *Connelly v. Dun & Bradstreet, Inc.*, 96 F.R.D. 339, 341 (D.Mass.1982); *Philadelphia Housing Auth. v. American Radiator & Standard Sanitary Corp.*, 294 F.Supp. 1148, 1149 (E.D.Pa.1969) ("Each individual member of an unincorporated association is a client of the association's lawyer."); *see United States v. American Radiator & Standard Sanitary Corp.*, 278 F.Supp. 608, 614 (W.D.Pa.1967); *Schwartz v. Broadcast Music*, 16 F.R.D. 31, 32–33 (S.D.N.Y.1954).

Recent ethical codes have made inroads into this rule, sometimes treating an unincorporated association as an "organization," capable of being represented separately from its members. *See, e.g.,* MICH. RULES OF PROF'L RESP.R. 1.13 (comment). This result is defensible in many circumstances, such as those posed by trade associations and unions. *See Greate Bay Hotel & Casino, Inc. v. City of Atlantic City*, 264 N.J.Super. 213, 624 A.2d 102 (1993). Each of these unincorporated associations has operations, employees and continuing existence separate from its members. Modern ethics analysis indicates that an attorney may represent such associations without creating an attorney-client relationship with its individual members. *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 92–365 (1992). The situation is different with regard to other types of

---

**6.** Dykema Gossett relied for this proposition on Judge Miles's decision in *Dalrymple*, in which he said that confidences must be provided by the "lay person" to counsel. 615 F.Supp. at 986. *Dalrymple* does not hold that information conveyed by one attorney to another cannot be deemed confidential. The court merely used the words "lay person" to identify the putative client. Dykema Gossett

would elevate this offhand language to a rule of law.

**7.** In *Arkoma*, the Supreme Court held that for diversity jurisdiction purposes, a limited partnership is a citizen of the all states within which its general and limited partners are citizens.

unincorporated associations, whose existence and interests are more intertwined with those of the individual members. In the case of unincorporated business partnerships, for example, the client is sometimes the partnership itself, *see, e.g.,* *Richter v. VanAmberg,* 97 F.Supp.2d 1255, 1262–63 (D.N.M.2000), while at other times the relationship extends to the individual partners as well. *See Rice v. Strunk,* 670 N.E.2d 1280, 1284–87 (Ind.1996); *accord Steinfield v. Marks,* No. 96 civ. 552(PKL), 1997 WL 563340 (S.D.N.Y. Sept. 8, 1997) (attorney representing joint venture represented each member); *Arpadi v. First MSP Corp.,* 68 Ohio St.3d 453, 628 N.E.2d 1335, 1339 (1994) (duty owed by attorney to partnership extends to individual partners); *Wortham & Van Liew v. Superior Court,* 188 Cal.App.3d 927, 233 Cal.Rptr. 725, 728 (1987) ("In the context of the representation of a partnership, the attorney for the partnership represents all the partners as to matters of partnership business.").

Recognition of the "group" as the sole client is incongruous if applied to the signatories of a joint defense agreement. The joint defense "group" has no meaning or existence beyond the litigation for which it was formed. The "group" arises with the litigation and disappears thereafter. Especially when the group is composed of defendants, it makes no sense to say that the common counsel's client is the "group," and not the actual parties defendant. The "group" is not a party to the case, and it is therefore incapable of being represented in the action. The defendants themselves are the only entities capable of being represented. Dykema Gossett has cited no authority holding, or even implying, that common counsel acting under a joint defense agreement represents only a fictional entity and not the litigants themselves. Such groups are, at best, joint ventures, and have no real existence or interests apart from the members.

If Dykema Gossett's argument were accepted, it could have serious adverse con-

sequences for the members of plaintiff litigation groups, such as the "Cork Street Landfill Group," represented by Dykema Gossett in the present case. At least two members of that group, Upjohn and the County of Kalamazoo, are not named parties plaintiff in this case. Certainly, it would come as a shock to those parties to learn that Dykema Gossett is really not their law firm and that the only client is the "Group." Presumably, absent some contractual provision to the contrary, the firm would be entirely free to sue Upjohn and the County at the conclusion of the present case, relying on the files and information amassed at their expense. At that point, the client group would no longer exist, and no party would be in a position to complain.

More basically, failure to recognize the members, and not the group, as the real party represented could jeopardize the substantive rights of plaintiff group members. Upjohn and the County have chosen to assert their claims for damages through the device of the Cork Street Landfill Group, and not as named plaintiffs. It is well settled, however, that an unincorporated association lacks standing to assert a claim for monetary damages incurred by its members. *See United Food & Comm. Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 546, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *Hunt v. Washington State Apple Adv. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *"Hunt* held that 'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members, but indicated that such participation would be required in an action for damages to an association's members, thus suggesting that an association's action for damages running solely to its members would be barred for want of an association's standing to sue." 517 U.S. at 546, 116 S.Ct. 1529. Here, there is no allegation that the Cork Street Landfill Group, as an entity, has been ordered to do any remediation of

the site or has incurred monetary injury to itself. Rather, the City, the County, MDS, and Pharmacia & Upjohn have been ordered to remediate the site. Nor does the complaint allege an assignment by these parties to the Group of their cause of action. In such circumstances, the individual members of the association are necessary parties to the lawsuit. *Warth v. Seldin*, 422 U.S. 490, 516, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Consequently, viewing the Group as an entity separate from its members, with an existence and rights independent of those of the individual clients composing the group, could undermine the substantive rights of those members of the Cork Street Group who are not named plaintiffs. Such a view, however, is not the one adopted by the federal courts in dealing with litigation groups in environmental cases. The courts treat these groups for what they are—convenient devices for the assertion of claims or defenses of similarly situated litigants—and "look through" the group structure to the constituent members. *See, e.g., Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648 (6th Cir.2000) (describing the plaintiff group as an "unincorporated association" but analyzing the claims of its constituent members). Viewing the group as the sole client makes even less sense when the group is composed of defendants. In the context of a defendant group, the individual defendants are the only possible client, as the unincorporated association is not even a party to the case.

Consequently, when a law firm undertakes an assignment as common counsel under a joint defense agreement, counsel must be deemed, as the name suggests, the attorney for all defendants in the group. "Accepting a common representation is not a risk-free activity. . . ." *Felix v. Balkin*, 49 F.Supp.2d 260, 270 (S.D.N.Y. 1999). The Joint Defense Group was formed to assert a joint defense to a CERCLA contribution lawsuit. The Joint Defense Agreement signed by the Members establishes the intended relationship between the Members of the Group, and their representatives. The terms of the Agreement establish that common counsel represented a Member unless the Member informed common counsel that it did not wish to be represented on a particular matter. If Dykema Gossett as common counsel intended to represent *only* the unincorporated Joint Defense Group (if such a bizarre result were even possible), it was incumbent upon common counsel to have insisted that such a provision appear clearly in the Agreement. Instead, the firm has now adopted a narrow post-hoc interpretation of its role, after it had been paid approximately $330,000 by the Members of the Joint Defense Group. In summary, the court finds that as common counsel, Dykema Gossett had a direct attorney-client relationship with Brunswick as a Member of the unincorporated Joint Defense Group.

### B. *Substantial Relationship*

■ The next issue is whether the Cork Street lawsuit is a "substantially related matter" in which the plaintiffs' interests are "materially adverse" to the interests of Dykema Gossett's former West KL Avenue clients. Unquestionably, Dykema Gossett's present represent of landfill owner/operator plaintiffs at Cork Street, seeking recovery of response costs from its former generator defendant clients, is materially adverse. The question whether the two matters are "substantially related" requires only slightly more detailed examination.

The commentary to Rule 1.9 indicates that the scope of a "matter" requires an examination of the facts of a particular situation or transaction and the nature and degree of the lawyers' involvement. "The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can justly be regarded as changing of sides in the matter in question." MICHIGAN RULES OF PROF'L CONDUCT R. 1.9 cmt. State ethics

opinions in this area are instructive. They state, "In case of doubt about whether a matter is substantially related, or whether confidential information relating to the former representation could be used to the disadvantage of the former client, a lawyer should decline the representation." RI–46 (citing *General Elec. Co. v. Valeron Corp.*, 608 F.2d 265 (6th Cir.1979)); *see also* Michigan Prof'l & Judicial Ethics Comm., Informal Op. RI–95 (1991).

In *General Electric v. Valeron*, 608 F.2d 265 (6th Cir.1979), General Electric moved for an order disqualifying defendant's counsel Bernard Cantor. Cantor had been retained as a patent attorney by General Electric during the period from 1965–67 and had prepared several draft patent applications for General Electric. General Electric filed suit in 1977 alleging that Valeron infringed General Electric's patent No. 3,341,920. Valeron denied infringement and sought a declaration of invalidity because of specified prior art and prior invention. The district court held a hearing and concluded that Cantor and his firm should be disqualified. General Electric successfully argued that Cantor's work in preparing drafts of several patent applications was substantially related to the subject matter of General Electric's lawsuit, the subject matter being Valeron's defense, denial of infringement and an assertion of invalidity based on prior art and prior invention. 608 F.2d at 267. The court rejected Valeron's assertion that General Electric was required to show a substantial relation between Cantor's work for it and the actual issues in the infringement lawsuit. The Sixth Circuit observed that the "narrower formulation" asserted by Valeron was "not supported by case law generally" and was contrary to settled authority. *Id.* (citing *Melamed v. ITT Cont'l Baking Co.*, 592 F.2d 290, 292 (6th Cir. 1979), and *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d 250 (5th Cir.1977) (former client "need only show that matters embraced within the pending suit are substantially related to matters or cause of action wherein the

attorney previously represented him.")). The Sixth Circuit also observed that "the narrower formulation might well be difficult to apply in practice since the actual issues in lawsuits are frequently not determined until long after the litigation has begun." *Id.* at 267.

In *Anchor Packing Co. v. Pro–Seal, Inc.*, 688 F.Supp. 1215, 1220–21 (E.D.Mich. 1988), the United States District Court for the Eastern District of Michigan, applying Michigan ethics rules, observed that, "[T]here is a substantial relationship between the two representations if facts pertinent to problems for which the original legal services were sought are relevant to the subsequent litigation." In its 1995 informal ethics opinion, RI–248, the Michigan Professional & Judicial Ethics Committee noted that Michigan had not taken a specific position on whether a "transactional analysis" or a narrower "issues analysis" should be applied.

The substantial relationship test was first fashioned by courts, and then codified into ABA Model Rule 1.9(a), from which MRPC 1.9 was adopted. In deciding whether a "substantial relationship" exists, the scope and subject matter of the former and present representations must be examined. Some cases use a "transactional analysis," which holds that a conflict exists if the prior representation and the subsequent representation involved even interconnected (but not the same) events which could reveal a pattern of client conduct; that is done on the theory that relevant confidences could have been acquired by the lawyer in question. See, for example *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263 ([7th Cir.] 1983). Other cases use a narrower "issues analysis," finding a "substantial relationship" only when the issues involved in the two cases or transactions are identical or virtually so. *See*, for example, *Lawyer Disci-*

*plinary Board v. Printz*, 192 W.Va. 404, 452 S.E.2d 720 (1994).[8]

Michigan Prof'l & Judicial Ethics Comm., Informal Op. RI–248 (1995). Michigan has not expressly decided whether a "transactional analysis" or "issues analysis" should be applied.

The court need not definitively resolve what is apparently an unresolved state-law issue. The "transactional analysis" and "issue analysis" labels are not particularly helpful, because even the "issues analysis" approach requires "analysis of the facts, circumstances and legal issues of the two representations."[9] *Printz*, 452 S.E.2d at 723. Under either approach, Dykema Gossett's representation of West KL Avenue defendants and its work for the Cork Street plaintiffs are substantially related.

Dykema Gossett, as common counsel, played the most significant role of any law firm in defending alleged generators of hazardous substances in the lawsuit initiated by the City of Kalamazoo, Kalamazoo County, Upjohn and Oshtemo Township. During the approximately three years the Joint Defense Group was in operation, Dykema Gossett deposed plaintiffs' key fact and expert witnesses, drafted discovery responses, probed weaknesses in the owner/operator's case and helped formulate the overall joint defense strategy. Dykema Gossett was compensated in excess of $330,000 for these legal services by the Joint Defense Group Members. Dykema Gossett's "degree of involvement" was extensive rather than minimal and foundational rather than peripheral. With regard to Dykema Gossett's "degree of involvement" in this lawsuit on behalf of plaintiffs, Dykema Gossett is clearly lead counsel. Dykema Gossett is at the center

of the plaintiffs' efforts to recover from the defendants in this lawsuit.

Comparing the West KL Avenue lawsuit and this lawsuit, there is nearly a complete identity of the plaintiffs in the two cases. The City of Kalamazoo, Kalamazoo County and Pharmacia & Upjohn were named plaintiffs in the previous case. They again seek recovery of response costs from purported generators of hazardous substances in this case. The West KL Avenue site was the successor municipal landfill to the Cork Street site. There is, as one would expect given the very close temporal and geographic relationship of the two sites, substantial overlap in the evidence relating to the liability of the alleged generators, including the moving party, Brunswick. There is significant overlap in the legal issues in these two lawsuits, with owner/operator plaintiffs seeking contribution from generators for recovery of response costs. The evidence in the two cases overlaps to such an extent that Dykema Gossett relied on deposition testimony in *Oshtemo Township* as the basis for its demand upon Brunswick and the other defendants in the present case. The West KL Avenue lawsuit and this lawsuit are substantially related.

## C. *Shared Confidences*

■ In *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d 250 (5th Cir.1977), the Fifth Circuit noted that there are significant distinctions between presumptions regarding exchange of confidential information depending upon whether there was a direct or indirect (implied) attorney-client relationship. In the case of a previous direct representation, the

---

**8.** It is noteworthy that no court has ever cited West Virginia's *Printz* decision as persuasive authority.

**9.** Some more recent cases abandon the transactional and issue analysis labels altogether. *See Cardona v. General Motors Corp.*, 942 F.Supp. 968, 973 (D.N.J.1996). "Indeed, the case law reveals that disqualification is proper when the 'similarity in the two representa-

tions is enough to raise a common-sense inference that what the lawyer learned from his former client will prove useful in his representation of another client whose interests are adverse to those of his former client.' " *Cardona*, 942 F.Supp. at 973 (quoting ABA/BNA Lawyer's Manual on Professional Conduct at 51:215 (1996)).

moving party seeking disqualification need only show that the matters embraced within the pending lawsuit are substantially related to the matter or cause of action where the attorney previously represented him. "This rule rests on a presumption that confidences potentially damaging to the client have been disclosed to the attorney during the former period of representation. The court may not even inquire as to whether such disclosures were in fact made or whether the attorney is likely to use the damaging disclosures to the detriment of his former client. The inquiry is limited solely to whether the matters of the present suit are substantially related to matters of the prior representation, and this is because this court recognizes that in order to aid frank exchange between attorney and client, it is necessary to preclude even a possibility that information given in confidence by a former client will ever be used without that client's consent." 559 F.2d at 252. Other cases make the same distinction between indirect and direct attorney-client relationships, creating an unrebuttable presumption of shared confidences in a direct attorney-client relationship. *Valeron,* 608 F.2d at 267; *see Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d at 608 (8th Cir.1977); *Rio Hondo Implement Co. v. Euresti,* 903 S.W.2d 128, 132 (Tx.App.1995). Courts are most likely to impose an unrebuttable presumption where, as here, the attorney has "switched sides." *See, e.g., Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1267–69 (7th Cir.1983); *Nelson v. Green Builders, Inc.,* 823 F.Supp. 1439 (E.D.Wis.1993); *Koch v. Koch Indus.,* 798 F.Supp. 1525, 1536 (D.Kan.1992). Other courts appear to allow counsel an opportunity to rebut the presumption in any case. *Matter of Osborne,* 237 Mich.App. 597, 603 N.W.2d 824, 830 (2000).

Here, even if the presumption concerning the exchange of confidential information is deemed rebuttable, Dykema Gossett did not rebut the presumption with regard to its representation as common counsel. Dykema Gossett represented the Members of the Joint Defense Group, including Brunswick, as common counsel. With help from its clients, Dykema Gossett analyzed weaknesses in the West KL plaintiffs' case and attempted to refute the testimony of the plaintiffs' experts. Dykema Gossett deposed the key witnesses and was at the heart of the joint defense strategy, which eventually resulted in the settlement of the West KL Avenue lawsuit. The firm's attorneys admit that they were privy to discussions regarding common litigation strategy, the testimony of expert witnesses and evaluation of the evidence. (Broekstra Aff., ¶ 8). This type of information was treated as confidential in the Joint Defense Agreement (¶ 9.3) and has been recognized by the federal courts as confidential for purposes of attorney disqualification motions. *GTE North, Inc. v. Apache Prod. Co.,* 914 F.Supp. 1575, 1579–80 (N.D.Ill. 1996) (sharing between counsel for co-defendants of investigation results, strategy, and legal merit of proceeding against an additional PRP required disqualification); *see also* MICH. RULES OF PROF'L CONDUCT R. 1.6 ("secret" is information gained in professional relationship that the client has requested to be held inviolate).

Dykema Gossett contends that the presence of crossclaims between Joint Defense Group Members in the West KL Avenue lawsuit and the relative nature of a generator defendant's contribution liability under section 113 of CERCLA provided Group Members with "every reason and incentive not to share confidential information related to the volume or toxicity of its waste." (Ferroli Aff., ¶¶ 9, 10). Dykema Gossett's argument is overstated and made with the benefit of significant hindsight stemming from recent developments in Sixth Circuit CERCLA case law.

The West KL Avenue plaintiffs sought to have each PRP defendant held jointly and severally liable for response costs under section 107 of CERCLA (42 U.S.C. § 9607). (*See* Complaint, ¶¶ 1, 143, and prayer for relief p. 40, attached as Ex. A to

Brunswick's motion). The same West KL Avenue plaintiffs also sought to have the defendants held jointly and severally liable under section 113 of CERCLA. (Id.). Faced with the potential joint and several liability for all response costs under sections 107 and 113, the Joint Defense Group Members had significant incentives to work cooperate and resist plaintiffs' lawsuit.

It was not until the Sixth Circuit's 1998 decision in Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344 (6th Cir.1998), that the Sixth Circuit held that PRPs could not bring an action under section 107 for joint and several cost recovery, but were limited to actions for contribution governed by the mechanisms set forth in section 113. The Sixth Circuit observed that under section 107, liability is joint and several on any PRP regardless of fault. "Only if a defendant can affirmatively demonstrate that the harm is divisible will damages from a cost recovery action under § 107(a) be apportioned according to fault. Given the nature of hazardous waste disposal, rarely if ever will a PRP be able to demonstrate divisibility of harm, and therefore joint and several liability is the norm." 153 F.3d at 348.[10] The Centerior decision also established that contribution liability under section 113(f)(1) was several rather than joint and several. 153 F.3d at 348. Section 113(f)(1)(a) states, "In resolving contribution claims, the court *may* allocate response costs among liable parties using such equitable factors as the court deems appropriate." 42 U.S.C. § 9613(f)(1) (emphasis added). In Centerior, the Sixth Circuit held, "In actions seeking contribution, unlike those for joint and several cost recovery, the burden is placed on the

plaintiff to establish the defendant's equitable share of response costs. Liability is not joint and several, but merely several." 153 F.3d at 348; see also Kalamazoo River Study Group. v. Menasha Corp., 228 F.3d 648, 658 n. 6 (2000) ("Liability under § 113 is ordinarily not joint and several, but several only."); Carter–Jones Lumber Co. v. Dixie Distrib. Co., 166 F.3d 840, 847 (6th Cir.1999) (same).

The affidavits of attorneys Ferroli and Broekstra are inadequate to rebut the presumption of shared confidences. "An attorney's duty of confidentiality is broader than just client communications, and extends to all confidential information, whether privileged or unprivileged, and whether learned directly from the client or from another source." Perillo v. Johnson, 205 F.3d 775, 799 (5th Cir.2000); GTE North, 914 F.Supp. at 1580. Dykema Gossett's affidavits really address only half of the problem. While the waste volume and toxicity of the Group Members may not have been discussed, the volume and toxicity of the plaintiffs' waste, weaknesses in their claims for response costs, weaknesses in their experts' testimony, possible legal arguments, and reasons why or why not to assert specific arguments were certainly explored, along with allocation of costs for purposes of settlement discussions. Dykema Gossett's glossing over its significant role as under the rubric of "general litigation strategy" is insufficient. Dykema Gossett obtained detailed insight into, and indeed formulated, most of the defense strategy, while being handsomely compensated by West KL Avenue defendants. It now seeks to turn around and use the factual and strategic insight it gained as common counsel to the detriment of a former client.[11] Under these circumstances,

---

10. *See also Organic Chemical Site PRP Group v. Total Petroleum, Inc.,* 58 F.Supp.2d 755, 760 (W.D.Mich.1999) (citing *Centerior* stating "The Sixth Circuit has recently determined that PRPs cannot bring cost recovery actions under CERCLA to impose joint and several liability on other PRPs, but are limited to bringing actions for contributions.").

11. In footnote 7 on page 14 of plaintiffs' brief, plaintiff assert that if Brunswick's motion to disqualify is granted, Brunswick's attorney, Todd Dickenson, and his law firm would also be disqualified because (1) Brunswick had filed a crossclaim against MDS in this case and (2) Mr. Trepod, MDS's attorney, attended Joint Defense Group meetings where litiga-

the Dykema Gossett firm must be disqualified from representing the plaintiffs in this lawsuit.

## II. Brunswick Did Not Contractually Waive the Conflict of Interest

 Dykema Gossett contends that Brunswick waived any conflict of interest. A client may expressly or impliedly waive his objection and consent to the adverse representation. *Trust Corp. of Montana v. Piper Aircraft*, 701 F.2d 85, 87 (9th Cir.1983). ABA Formal Opinion 372 affirmed the validity of prospective waivers. A prospective waiver should identify the potential opposing party, the nature of the likely subject matter in dispute and permit the client to appreciate the potential effect of the waiver.

> The closer . . . a prospective waiver can get to circumstances where not only the actual adverse client but also the actual potential future dispute are identified, the more likely it will be that a prospective waiver is consistent with the requirement of the Model Rules that consent be attended by a consultation that communicates information reasonably sufficient to permit the client to appreciate the significance of the matter in question.

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 372 (1993). The goal should be for the client to be able to recognize the legal implications and possible effects of the representation at the time the waiver is signed. This will turn not only on the language of the waiver but the sophistication of the client, the client's familiarity with the conflict, the longevity of the relationship between the client and lawyer, and the legal issues involved.

 In reviewing the relevant contractual provisions of the Joint Defense Agreement, the court is guided by the principles regarding prospective waivers and the con-struction of contracts. It is the court's duty to ascertain from the language of the Joint Defense Agreement what the parties to the contract intended when they entered into the Agreement. The court will accord the words and phrases of the contract their plain meaning and will not rewrite unambiguous language. When the words of a written contract are clear and unambiguous and have a definite meaning, the court has no right to look to extrinsic evidence to determine their intent. Indeed, if the language of the entire contract is clear and unambiguous, there is no room for construction by the courts, and in such case, the language must be held to express the intention of the parties and the court need not search for meanings nor indulge in inferences as to the intention of the parties. *See Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 373 (6th Cir.1998); *Central Jersey Dodge Truck Center, Inc. v. Sightseer Corp.*, 608 F.2d 1106, 1109 (6th Cir.1979); *W.R. Grace & Co. v. Goodyear Tire & Rubber Co.*, 1:99cv 305 (W.D.Mich.1999).

 The Joint Defense Agreement contains five waiver provisions:

7. *WAIVER OF CONFLICT OF INTEREST*

If the Group engages common counsel, consultants or experts, or otherwise assigns a task to a Member or Members to be funded as a Shared Cost (collectively, "Representatives"), each Member agrees that: (1) it will not claim or assert that, based solely on said Representative's past or present representation of a Member, said Representative has a conflict of interest in performing services authorized by the Group and arising out of the West KL Avenue Landfill Site, unless within twenty (20) days of receiving notice of intent to hire said Representative; (2) it will not claim or assert that, based solely upon said

---

tion strategies and issues related to Joint Defense Group expert witnesses were discussed. There is no motion to disqualify Mr. Dickenson or his firm before the court. It is unlikely that if such a motion were filed that it would be considered timely. Nor would the plaintiffs be in a position to raise such a claim, as Mr. Dickenson has not switched sides.

Representative's representation of the Group under the terms of this Agreement, said Representative has a conflict of interest in connection with any representation of any other person or entity in a matter pending as of the date of receiving notice of intent to hire said Representative, unless the Member notifies the Group of the claimed conflict within twenty (20) days of receiving said notice; (3) it will not claim or assert that, based solely upon said Representative's representation of the Group under the terms of this Agreement, said Representative has a conflict of interest in any future representation of any person or entity unless the subject matter relating to said representation arises out of or is connected to the West KL Avenue Site or involves or could involve any facts or information obtained from the Member during the term of this Agreement; (4) in the event that any conflict develops in the performance of work authorized by the Group or by any Representative and the performance of work authorized by a Member that has retained that Representative, the Member consents to said Representative's continued performance of the work authorized by the Group; and (5) is a Member withdraws or is removed from this Agreement or its representation by any Representative is in any way terminated, it will raise no objection to the continued representation by such Representative of all or any of the other Members in connection with any services arising out of the West KL Avenue Landfill Site.

Plaintiffs claim waiver by Brunswick based upon subsection 3. This waiver provision is quite limited. It does not waive objections to future representation if (a) the subject matter relating to said representation "arises out of" or "is connected to the West KL Avenue Site" or (2) "involves" or "could involve" any facts or information "obtained from the Member during the term of this Agreement." All of the facts tending to show that these two cases are substantially related are likewise sufficient to show that the exception to the waiver has been satisfied by Brunswick. The subject matter of Dykema Gossett's present representation of plaintiffs is certainly within the broad scope of being "connected to" the West KL Avenue site. Dykema Gossett's representation of plaintiffs "could involve" facts or information obtained from Members of the Joint Defense Group by Dykema Gossett as common counsel during the term of the Joint Defense Agreement, and counsel for Dykema Gossett admitted as much at oral argument. The court finds that Brunswick did not contractually waive Dykema Gossett's present conflict of interest.

### III. Other Relevant Factors

Courts confronted with motions to disqualify an attorney must be sensitive to the competing interests of preserving client confidences and the integrity of the legal system, on one hand, and the hardship of depriving a party of its counsel of choice, on the other. *See Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222, 224 (6th Cir.1988); *Dalrymple v. National Bank & Trust Co. of Traverse City,* 615 F.Supp. at 984. It has been observed that motions for disqualification are becoming more common, and are often used as a litigation strategy to disadvantage the opponent. *Manning,* 849 F.2d at 224. Although disqualification motions in this district are not common, and tactical motions are rarer still, the court must be cognizant of the factors weighing both for and against disqualification.

This court discerns no evidence of a tactical motivation on the part of Brunswick in seeking disqualification of its former common counsel. Brunswick raised the issue promptly at the Rule 16 conference, and filed its motion within the time set by Judge McKeague in the case management order. The interest of Brunswick in not facing counsel who formerly represented the company in closely related litigation, and is still in possession of the files

 

and records of the former group, is clearly legitimate and substantial. Paragraph 19 of the Ferroli affidavit demonstrates the significant scope of legal services performed by Dykema Gossett on behalf of Brunswick and the other Group Member defendants. Dykema Gossett was the most active (and highly compensated) common counsel in the *Oshtemo Township* case.

■ Plaintiffs have not presented the court with affidavits or other factual materials establishing the likelihood of hardship if their attorneys are disqualified. The court may nevertheless presume that any party forced to retain new counsel midway in litigation will face expense and delay as a result. This expense and delay, however, is not sufficient to overcome Brunswick's legitimate interest in not facing its former common counsel and the equally weighty interest of the legal system in preventing unseemly "switching of sides" by attorneys who act as officers of the court. A refusal to recognize the predominant interest advanced by Brunswick would undermine the utility of all common counsel devices employed by litigants in the federal courts. If common counsel were able to disavow any obligation to the clients represented, admitting allegiance only to a nonexistent ad hoc "group" as the client, no rational client would participate in a common counsel arrangement. By accepting such rationalizations, the court would prove itself blind to the realities of common representation and to the high obligation of the legal profession of undivided loyalty to its clients. Consequently, any inconvenience to plaintiffs, who clearly knew of the relationship between Dykema Gossett and plaintiffs' former and present adversaries, does not militate against disqualification. This court will be vigilant to prevent any prejudice to plaintiffs in the present case resulting from disqualification and will afford substitute counsel a reasonable opportunity to prepare the case.

*Conclusion*

For the reasons set forth above, defendants' motion to disqualify Dykema Gossett (docket # 77) will be granted and plaintiffs' motion to strike (docket # 88) will be denied.