S.D. WARREN COMPANY d/b/a Sappi Fine Paper North America, and Lignin Insurance Company, Ltd., Plaintiffs,

v.

DUFF–NORTON, a division of Yale Industrial Products, Inc., Defendant.

No. 1:03–CV–421.

United States District Court, W.D. Michigan, Southern Division.

Jan. 6, 2004.

Robert W. Fisher/Mark P. Huntin, for plaintiffs.

Patrick F. Geary/Michael R. Grimm, Sr., for defendant.

## *OPINION*

QUIST, District Judge.

Plaintiffs in this case (hereinafter referred as the "*Sappi*" matter), S.D. Warren Company, d/b/a/ Sappi Fine Paper of North America ("Sappi"), and Lignin Insurance Company, Ltd., have sued Defendant, Duff–Norton, a division of Yale Industrial Products, Inc. The underlying lawsuit is a products liability action in which Plaintiffs allege that a rotary joint union produced by Defendant caused a fire

and resulting damage at Sappi's manufacturing facility. Now before the Court is Defendant's motion to disqualify Plaintiffs' counsel, the law firm of Robins, Kaplan, Miller & Ciresi, L.L.P. ("RKMC"). Defendant claims certain attorneys now with RKMC represented Defendant in prior litigation that is substantially related to this case, creating a conflict of interest under the Michigan ethics rules that was not properly abated by screening. For the reasons stated below, the Court will deny Defendant's motion because the two matters are not substantially related.

## I. *BACKGROUND*

### A. Facts

In January 1995, a fire destroyed a carpet manufacturing mill located in LaGrange, Georgia, and owned by Milliken & Company ("Milliken"). (Pl.'s Resp. Br. at 4.) Milliken claimed that the fire was caused by a defective Model 9000 rotary union manufactured by Duff–Norton Company, Inc., a predecessor company to the defendant in the matter now before the Court. In 1996, Milliken filed an action for negligence and breach of warranty against Duff–Norton Company, Inc., in the Superior Court of Troup County, Georgia, captioned *Milliken & Company v. Duff-Norton Company, Inc. & Dixie Industrial Supply Company*, No. 96–CV–964 (the "*Milliken*" matter). (*Id.* at 3–4.) The case settled in late 1998, and was dismissed in early 1999. (*Id.* at 4.) The Minneapolis law firm of Fetterly & Gordon ("F & G") represented Duff–Norton as lead counsel in the *Milliken* matter. Several F & G attorneys appeared on behalf of Duff–Norton, including James Fetterly and Christopher Sorenson. (*Id.* at 3.) Fetterly says that he focused on issues related to the fire incident in *Milliken* while one of his partners primarily handled issues related to the alleged failure of the rotary union. (Fetterly Aff. ¶ 9–10, Pl.'s Resp.

Br. Ex. 12.) During the course of representing Duff–Norton, F & G billed over $6 million in fees and expenses. (Def.'s Br. at 2.)

On November 2, 1999, a fire allegedly caused by a defective Model 2500 rotary union manufactured by Duff–Norton damaged the Sappi paper mill in Muskegon, Michigan. (Def.'s Br. at 2.) Shortly thereafter, attorneys in the Atlanta office of the RKMC law firm undertook to represent Plaintiffs in the present action. (*Id.*) RKMC conducted several years of factual investigation and analysis to develop Plaintiff's claims, and on June 27, 2003, filed the Complaint in the present action against Duff–Norton, asserting claims of negligence and breach of warranty. (Pl.'s Resp. Br. Ex. 5.)

Meanwhile, in the fall of 2000, the partners of F & G decided to dissolve the firm by December 31, 2000. (Fetterly Aff. ¶ 13, Pl.'s Resp. Br. Ex. 12.) Fetterly and another F & G attorney, Steven Lickteig, interviewed for new jobs with the Minneapolis office of RKMC in November and December of 2000. During the course of these interviews, Fetterly provided RKMC with a list of former clients. (Fetterly Aff. ¶ 14, Pl.'s Resp. Br. Ex. 12.) RKMC advised Fetterly that the firm had an existing case against Duff–Norton and that, should he accept a position with the firm, he would be screened from the matter. (Fetterly Aff. ¶ 14, Pl.'s Resp. Br. Ex. 12.) Lickteig had not worked on the *Milliken* matter while at F & G. (Lickteig Aff. ¶ 2, Pl.'s Resp. Br. Ex. 14.) Fetterly and Lickteig accepted positions with RKMC in December of 2000 and joined the firm effective January 2, 2001. (Fetterly Aff. ¶ 14–16, Pl.'s Resp. Br. Ex. 12 at 4.) Fetterly's secretary, Mary–Alice Boesel, joined RKMC at the same time as Fetterly. (Boesel Aff. ¶ 3, Pl.'s Resp. Br. Ex. 13.) Fetterly says that he spent most of his

first few months with RKMC tying up matters from his old firm, attending meetings and conferences, and vacationing. (Fetterly Aff. ¶ 16–18, Pl.'s Resp. Br. Ex. 12) He claims that he has never spoken with RKMC attorneys about *Milliken,* never accessed any files or information related to the *Sappi* matter, and never visited RKMC's Atlanta office. (Fetterly Aff. ¶ 23, Pl.'s Resp. Br. Ex. 12.)

Robert W. Fisher and William H. Stanhope are the two partners at RKMC who act as lead counsel for Plaintiff in the *Sappi* matter. (Fisher Aff. ¶ 3, Pl.'s Resp. Br. Ex. 7.) On or about January 15, 2001, Fisher learned that Fetterly had joined the firm. (Fisher Aff. ¶ 7, Pl.'s Resp. Br. Ex. 7.) Recognizing Fetterly's name from the *Sappi* litigation, Fisher contacted Stanhope, who in turn spoke with John Love, a member of RKMC's professional responsibility committee. (Fisher Aff. ¶ 3, Pl.'s Resp. Br. Ex. 7.) Although he says he believed the *Milliken* and *Sappi* matters were not related, as a precaution Fisher instructed members of the *Sappi* team not to discuss the lawsuit with the transferring personnel. (Fisher Aff. ¶ 7, Pl.'s Resp. Br. Ex. 7.) Love contacted RKMC's conflict's coordinator, Barbara Lowe, about routing a screening memo. On January 23, 2001, RKMC distributed an internal firm-wide memo noticing the screening of the transferring personnel from the *Sappi* matter. (Pl.'s Resp. Br. Ex. 9.) Sorenson joined RKMC's Minneapolis office on February 26, 2001. (Pl.'s Resp. Br. Ex. 11.) Prior to his arrival, on February 19, 2001, RKMC issued a second firm-wide internal memo screening Sorenson from the *Sappi* matter. (Pl.'s Resp. Br. Ex. 11.)

RKMC filed the Plaintiffs' complaint in the *Sappi* matter on June 27, 2003. (Pl.'s Resp. Br. Ex. 5.) Soon thereafter, the Clausen Miller firm, as counsel for Defendant, advised RKMC that there may be an issue regarding a conflict of interest. RKMC disagreed, and faxed to Clausen Miller the RKMC screening memorandum dated February 19, 2000. RKMC filed with this Court its first notice of conflict screening on July 17, 2003, attaching its screening memorandum of February 19, 2001. (Pl.'s Resp. Br. Ex. 17.) On August 19, 2003, Clausen Miller again wrote RKMC, stating concerns about a conflict of interest and requesting documents and information relevant to the issue. (Def.'s Br. Ex. 2.) RKMC responded to Clausen Miller's letter on August 27, 2003, denying any conflict and requesting grounds for Clausen Miller's assertions. (Def.'s Br. Ex. 4.) On September 5, 2003, Clausen Miller replied to RKMC's letter, enclosing numerous affidavits supporting the conflict of interest allegations. (Def.'s Br. Ex. 3.) Clausen Miller filed a motion to disqualify on behalf of Defendant on September 11, 2003. On September 26, 2003, RKMC filed its supplemental screening notice with this Court, attaching its internal screening memorandum dated January 23, 2001.

## B.   Arguments—Motion to Disqualify

Defendant argues that the Michigan Rules of Professional Conduct require the disqualification of RKMC in the *Sappi* matter for the following reasons. First, Defendant contends that *Sappi* is substantially related to *Milliken.* Defendant asserts that the facts, issues, evidence, and law in the matters overlap. The two matters involve alleged failures of rotary unions made by Defendant which led to oil leaks and fires. Both rotary unions had the same functional purpose and were designed, engineered, and manufactured at the same facility by the same personnel. Both rotary unions had the same types of warranties and disclaimers and were produced under the same operational and quality control standards, guidelines, policies and procedures. In addition, both lawsuits involve many of the

same legal and factual product liability issues and defenses, as well as many of the same witnesses. RKMC even touted the similarities between the *Milliken* and *Sappi* matters.

Second, Defendant posits that Fetterly and his team acquired confidential information about Defendant in *Milliken* that is relevant to the *Sappi* case. F & G's *Milliken* billing records show that it had unfettered access to Defendant's secrets and personnel. Third, Defendant maintains that RKMC must be disqualified because it failed to timely screen Fetterly from the *Sappi* matter after he arrived at RKMC. Therefore, the presumption that Fetterly shared Defendant's confidences from the *Milliken* matter remains unrebutted. Fourth, Defendant claims disqualification is warranted because RKMC failed to promptly notify this Court or any other tribunal of the screen. RKMC notified this Court over two and a half years after Fetterly joined RKMC, three weeks after it filed suit, and only after prompting by Defendant's counsel.

RKMC argues that it should not be disqualified for the following reasons. First, the *Milliken* matter is not substantially related to the *Sappi* matter. The cases do not arise out of a common nucleus of facts, and there is no overlap in the evidence between the two cases. The matters are two factually separate and distinct product liability lawsuits arising out of different incidents involving different facilities, affecting different companies, occurring at different times and in different states, involving differently designed and manufactured products, different product failures, different fires, and different damage. The matters are also legally distinct, as they involve different parties, different legal claims regarding the product defect asserted, different claims regarding damages asserted, different applicable state law, and different liability insurers for Defendant.

Second, RKMC argues against disqualification because the transferring personnel acquired no information in *Milliken* that remains protected under the Michigan ethics rules and that is material to the *Sappi* matter. Therefore, the presumption that the transferring personnel acquired protected information material to the *Sappi* matter is rebutted. Third, RKMC argues that it properly implemented screening sufficient to avoid imputed disqualification of the firm. Fourth, disqualification of RKMC would deprive Plaintiffs of their choice of counsel and cause Plaintiffs severe hardship by depriving them of the almost four years of work RKMC has done on their behalf in the *Sappi* matter.

## II. *LEGAL STANDARDS*

### A. Attorney Disqualification Generally

■ The power to disqualify an attorney from a case is "incidental to all courts, and is necessary for the preservation of decorum, and for the respectability of the profession." *Kitchen v. Aristech Chem.*, 769 F.Supp. 254, 256 (S.D.Ohio 1991) (quoting *Ex Parte Burr*, 9 Wheat. 529, 22 U.S. 529, 531, 6 L.Ed. 152 (1824)). However, "the ability to deny one's opponent the services of capable counsel, is a potent weapon." *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir.1988). A motion to disqualify is the proper method for a party-litigant to bring an issue of conflict of interest or breach of an ethical duty to the court's attention. *Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir.1980). When confronted with such a motion, courts must be sensitive to the competing public policy interests of preserving client confidences and of permitting a party to retain counsel of its choice. *Manning*, 849 F.2d at 224. In order to resolve these competing interests, the courts must balance the interest of the public in the prop-

er safeguarding of the judicial process together with the interests of each party to the litigation. *General Mill Supply Co. v. SCA Servs., Inc.*, 697 F.2d 704, 715 (6th Cir.1982).

The Sixth Circuit applies a three-part test for attorney disqualification: (1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification. *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 889 (6th Cir.1990). The movant has the burden of proving that opposing counsel should be disqualified. *See Bartech Indus., Inc. v. Int'l Baking Co., Inc.*, 910 F.Supp. 388, 392 (E.D.Tenn.1996). A decision to disqualify counsel must be based on a factual inquiry conducted in a manner which will afford appellate review. *General Mill Supply Co.*, 697 F.2d at 710.

The Michigan Rules of Professional Conduct ("MRPC") govern attorneys' ethical responsibilities in this state. This Court has adopted the MRPC for regulating practice before it. LCivR 83.1(j) (attorneys practicing before this Court are "subject to the Rules of Professional Conduct adopted by the Michigan Supreme Court"). When a lawyer moves or has recently moved from one firm to another, the situation is governed by MRPC 1.9 and 1.10(b).

MRPC 1.9 enumerates when an individual attorney is disqualified from representation (emphasis added): [1]

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the *same or a substantially related matter* in which that person's *interests are materially adverse* to the interests of the former client unless the former client *consents* after consultation.

(b) Unless the former client consents after consultation, a lawyer shall not knowingly represent a person in the *same or a substantially related matter* in which a firm with which the lawyer formerly was associated has previously represented a client (1) whose *interests are materially adverse* to that person, and (2) about whom the lawyer had acquired *information protected by Rule 1.6 and 1.9(c) that is material* to the matter.

MRPC 1.10(b) imputes an attorney's disqualification to the attorney's new firm absent compliance with a two-pronged test requiring screening and notification to the tribunal (emphasis added):

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the *same or a substantially related matter* in which

---

1. The Comment to MRPC 1.9 explains the balance of interests between the former and new client:

    When lawyers have been associated in a firm but then end their association, the problem is more complicated. First, the client previously represented must be reasonably assured that the principle of loyalty to the client is not compromised. Second, the rule of disqualification should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel. Third, the rule of disqualification should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association. In this connection, it should be recognized that today many lawyers practice in firms, that many, to some degree, limit their practice to one field or another, and that many move from one association to another several times in their careers. If the concept of imputed disqualification were applied with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel.

that lawyer, or a firm with which the lawyer was associated, is disqualified under Rule 1.9(b), unless:

(1) the disqualified lawyer is *screened* from any participation in the matter and is *apportioned no part of the fee* therefrom; *and*

(2) *written notice is promptly given to the appropriate tribunal* to enable it to ascertain compliance with the provisions of this rule.

## B. Substantial Relationship Test

The parties agree that (1) the transferring attorneys represented Defendant in *Milliken;* (2) the transferring attorneys later joined RKMC; (3) the interests of Plaintiff Sappi, which is RKMC's client in the pending *Sappi* matter, are now materially adverse to Defendant; and (4) Defendant never consented to RKMC's representation of Plaintiff Sappi. With these issues established, the threshold inquiry is whether the *Milliken* and *Sappi* matters are substantially related. If the two matters are not substantially related, the Court's analysis ends and Defendant's motion to disqualify RKMC must be denied.

The term "substantially related" is nowhere defined in the MRPC. However, the definition of "substantial" in the Preamble to MRPC 1.0 states: "when used in reference to degree or extent, denotes a material matter of clear or weighty importance." The Comment to MRPC 1.9 states that "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a *wholly distinct problem of that type* even though the subsequent representation involves a position adverse to the prior client." (emphasis added) In addition, "the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client." *Id.*

The Michigan Professional & Judicial Ethics Committee has issued several ethics opinions discussing the meaning of "substantially related." One such opinion includes a frequently-quoted statement that "a subsequent matter is substantially related to the subject matter of a former representation if the *factual or legal issues overlap or* if there is a *likelihood that confidential information* obtained in the former representation will have *relevance* to the subsequent representation. In the case of doubt, and absent the consent of the former client, a lawyer should decline the representation." Mich. Prof'l & Judicial Ethics Comm., Op. RI–95 (1991) (emphasis added). In determining whether two matters are substantially related, "[t]he scope and subject matter of the former and present representations must be examined." Mich. Prof'l & Judicial Ethics Comm., Op. RI–287 (1997). In its 1995 informal ethics opinion RI–248, the Committee noted that Michigan has not taken a specific position on whether a "transactional analysis" or a narrower "issues analysis" should be applied:

The "substantial relationship" test was first fashioned by courts, and then codified into ABA Model Rule 1.9(a), from which MRPC 1.9 was adopted. In deciding whether a "substantial relationship" exists, the scope and subject matter of the former and present representations must be examined. Some cases use a *"transactional analysis,"* which holds that a conflict exists if the prior representation involved even interconnected (but not the same) events which could reveal a pattern of client conduct; this is done on the theory that relevant confidences could have been acquired by the lawyer in question. See, for example, *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263 (C.A.7 1983). Other cases use a narrower *"issues analysis,"* finding a

"substantial relationship" only when the *issues* involved in the two cases or transactions are identical or virtually so. See, for example, *Lawyer Disciplinary Board v. Printz*, 192 W.Va. 404, 452 S.E.2d 720 (1994). Michigan has not taken a specific position as to which analysis should be used.

Mich. Prof'l & Judicial Ethics Comm., Op. RI–248 (1995) (emphasis added).

Magistrate Judge Scoville of this district discussed the MRPC's substantial relationship requirement in *City of Kalamazoo v. Mich. Disposal Serv. Corp.*, 125 F.Supp.2d 219, 238–40 (W.D.Mich.2000), *aff'd* 151 F.Supp.2d 913 (W.D.Mich.2001) (Quist, J.). In that case, two CERCLA lawsuits seeking recovery of response costs from purported generators of hazardous wastes were found to be substantially related. In the first action, the plaintiffs sought recovery of response costs incurred by them on account of the release or threatened release of hazardous substances from what was called the "West KL Avenue Landfill" site, which the City of Kalamazoo operated from 1968 to 1981. *Id.* at 223. In the second action, the plaintiffs sought similar relief for releases from what was called the "Cork Street Landfill" site, which had been used as a landfill since 1925 and which the City of Kalamazoo operated from 1961 to 1968. *Id.* at 230. Although the landfills were in different locations, the court found that the "West KL Avenue Landfill is accurately characterized as the successor landfill to the Cork Street site" because "West KL opened immediately after Cork Street closed and began accepting waste from virtually the same group of generators and transporters." *Id.* The court noted that "the industrial processes generating the waste were identical for each site," the same company hauled waste

to each site, and "waste formerly hauled to the one was merely redirected to the other." *Id.* Moreover, "[e]xcept for relevant time frames, the two cases pose similar issues and rely upon overlapping evidence." *Id.* In concluding that the two matters were substantially related, the court noted:

> Comparing the West KL Avenue lawsuit and this lawsuit, there is nearly a complete identity of the plaintiffs in the two cases. The City of Kalamazoo, Kalamazoo County and Pharmacia & Upjohn were named plaintiffs in the previous case. They again seek recovery of response costs from purported generators of hazardous substances in this case. The West KL Avenue site was the successor municipal landfill to the Cork Street site. There is, as one would expect given the very close temporal and geographic relationship of the two sites, substantial overlap in the evidence relating to the liability of the alleged generators, including the moving party, Brunswick. There is significant overlap in the legal issues in these two lawsuits, with owner/operator plaintiffs seeking contribution from generators for recovery of response costs. The evidence in the two cases overlaps to such an extent that Dykema Gossett [the law firm] relied on deposition testimony in *Oshtemo County* [the first lawsuit] as the basis for its demand upon Brunswick and the other defendants in the present case. The West KL Avenue lawsuit and this lawsuit are substantially related.

*Id.* at 240.

*City of Kalamazoo* does not state precisely which test the court used to reach its conclusion, finding instead that the matters were substantially related under *either* the "transactional analysis" or the "issue analysis" tests and that those labels are "not particularly helpful" anyway.[2] *Id.*

---

2. Defendant incorrectly cites *City of Kalamazoo* as endorsing a "common sense" evaluation to determine the existence of a "substan-

tial relationship." *City of Kalamazoo* did not explicitly endorse such a test under the Michi-

The "transactional analysis" probably constitutes the preferred approach in this circuit. The Sixth Circuit in *General Electric Co. v. Valeron Corp.*, 608 F.2d 265 (6th Cir.1979), rejected the narrow "issues analysis" for proving substantial relation in that case, as that test "might well be difficult to apply in practice since the actual issues in lawsuits are frequently not determined until long after the litigation has begun." 608 F.2d at 267. The *General Electric* court upheld the disqualification of an attorney who had prepared drafts of several patent applications for General Electric and then undertook to represent Valeron in litigation in which Valeron asserted defenses of denial of infringement and invalidity based on prior art and invention. *Id.* The trial court had found that the matters were substantially related because the attorney, while working at General Electric, had access to files on General Electric's patents, patent applications, patent collections and prior art collections on fitting and pocketing inserts in tools, and the attorney received confidential disclosures while doing his work. *Id.* Applying the clearly erroneous standard, the appeals court affirmed the trial court's disqualification decision. *Id.*

In *Anchor Packing Co. v. Pro–Seal, Inc.*, 688 F.Supp. 1215 (E.D.Mich.1988), the court discussed various formulations of the substantial relationship test in different circuits. The court rejected the Second Circuit test, which requires a showing that the relationship between the issues in

the cases must be "patently clear," and that the issues be "identical" or "essentially the same." *Id.* at 1220. That test embodied a "narrower formulation [which] is not supported by case law generally and is contrary to the formulation as set out by this court." *Id.* Instead, the court cited approvingly to *Trone v. Smith*, 621 F.2d 994, 1000 (9th Cir.1980), which opined that a substantial relationship "is measured by the allegations in the complaint and the nature of the evidence that would be helpful in establishing those allegations." *Id.* Similarly, the court invoked *U.S. Football League v. National Football League*, 605 F.Supp. 1448, 1459 (S.D.N.Y.1985), which held: "The presence of a common factual question meant that the substantial relationship test was satisfied. So there is a substantial relationship between the two representations if facts pertinent to problems for which the original legal services were sought are relevant to the subsequent litigation." *Id.* at 1220–21.

In deciding that the two matters before it were substantially related, the *Anchor Packing* court noted that in the second matter, the defendants (employees) asserted in their counterclaim that the plaintiff (an employer) breached numerous obligations that it had undertaken as their employer. *Id.* at 1222. This counterclaim had "very distinct similarities" to the claim in the first matter where an aggrieved ousted employee similarly claimed that the employer had breached its employment obligations. *Id.* In addition, the attorney,

---

gan rules. The opinion merely cites, in footnote 9, to a District of New Jersey opinion, *Cardona v. General Motors Corp.*, 942 F.Supp. 968 (D.N.J.1996), as an example of a case that abandons the "transactional" and "issue" analysis labels. *Cardona* mentions a "common sense" evaluation, stating: "Indeed, the case law reveals that disqualification is proper when the 'similarity in the two representations is enough to raise a common-sense inference that what the lawyer learned from his

former client will prove useful in his representation of another client whose interests are adverse to those of the former client.' " 942 F.Supp. at 973 (quoting ABA/BNA Lawyer's Manual on Professional Conduct at 51:215 (1996)). But, as *City of Kalamazoo* makes clear, "Michigan has not expressly decided whether a 'transactional analysis' or 'issues analysis' should be applied." 125 F.Supp.2d at 240.

who had represented the employer in the first case and now sought to represent employees in the second case, would have a "huge and unfair advantage" because he had "obtained much of the needed information" as a result of the first representation—information that "revealed the exact nature" of the employer's grievances against the employees in the second case. *Id.* For these reasons, the court found the cases to be substantially related.

In *McKane v. City of Lansing*, 861 F.Supp. 47 (W.D.Mich.1994), the court denied a motion for disqualification for two reasons. First, the "subject matters" of the attorney's representations were not "substantially related." In the first matter, a former city mayor brought an action for unused sick and vacation days, a benefit available to all regular, full-time employees of the city. *Id.* at 49. In the second matter, the same former city mayor brought an action claiming he was entitled to early retirement benefits under a plan that had not been enacted at the time of the prior matter. *Id.* Although both matters involved application of the city's personnel rules and charter, the prior case turned on whether the plaintiff was a public official or public employee for purposes of compensation for unused sick and vacation days, whereas the subsequent case revolved around entitlement to early retirement benefits. *Id.* Second, it was undisputed that the attorney had not received any confidential information. *Id.* Therefore, the court held: "In light of the differences between the [prior] litigation and the instant case and the fact that there is no issue of confidential information received in the previous litigation relevant to the instant litigation, defendants' motion for disqualification of plaintiff's counsel will be denied." *Id.*

In *Haworth, Inc. v. Wickes Manufacturing Co.*, No. 1:93–CV–851, 1994 U.S. Dist. LEXIS 11580 (W.D.Mich.1994), the court discussed the question of whether two lawsuits were substantially related within the meaning of MRPC 1.9.

In considering this question, the Court should note that the Sixth Circuit has avoided narrow interpretations of whether a representation is substantially related. See *General Electric Co. v. Valeron Corp.*, 608 F.2d 265, 267 (6th Cir.1979) (holding that preparation of patent applications was substantially related to a later patent infringement case because the attorney had access to confidential files relating to all patents). However, courts in the Seventh Circuit have also said that general knowledge of a company's inner workings acquired during another representation is not sufficient to warrant disqualification. *International Paper Co. v. Lloyd Mfg. Co.*, 555 F.Supp. 125, 136 (N.D.Ill.1982) (citing *Westinghouse Electric Corp. v. Rio Algom, Ltd.*, 448 F.Supp. 1284 (N.D.Ill. 1978), aff'd, 580 F.2d 1311 (7th Cir. 1978)). See also Michigan Rules of Professional Conduct, Comments to Rule 1.9.

*Id.* at *6–7. In *Haworth*, the defendants in an environmental case moved for disqualification of the plaintiff's counsel because during the time the allegedly wrongful conduct occurred, plaintiff's counsel had represented one of the defendants on matters such as real estate transactions, stock and debt transactions, sales commissions disputes, local income tax disputes, pension and profit sharing matters, workers compensation disputes, and product liability disputes. *Id.* at *3. The court determined that "the information that the law firm acquired from the representations is much more akin to the general information described in International Paper rather than any specific knowledge pertaining to the issues in this law suit. As such, the Court concludes that the prior representa-

tions are not substantially related to the issues involved in this lawsuit." *Id.* at *7.

## III. *ANALYSIS*

Defendant argues that the *Milliken* and *Sappi* matters are substantially related for two reasons. First, Defendant submits that the rotary unions at issue in the matters are factually similar in terms of the alleged manufacturing and design defects, and that the cases share similar relevant facts with respect to Defendant's practices and policies. Second, Defendant claims that the *Milliken* and *Sappi* matters are similar from a litigation perspective, as they involve similar negligence and breach of warranty claims, defenses, evidence, and witnesses. The Court will address the purported factual and legal similarities in turn.

### A. Substantial Relationship—Factual Issues

■ The parties have provided the Court with extensive scientific and technical materials asserting and denying the factual similarities between the rotary unions and the fires in the *Milliken* and *Sappi* matters. The Court has examined all these items at length. In general, the Court is persuaded by the technical analyses provided by RKMC's experts Slater (Pl.'s Resp. Br. Ex. 1.), Pagni (Pl.'s Resp. Br. Ex. 2.), and Arnold (Pl.'s Resp. Br. Ex. 3.), on which the Court relies in the following discussion. There can be no question that the rotary unions in the two matters were in some respects similar. Both were designed and manufactured by Defendant to perform the generic function of allowing hot oil to pass between a stationary and a rotating component, and both allegedly failed, causing oil leaks that led to fires. However, as the following discussion explains, for purposes of the "substantially related" analysis the rotary unions were fundamentally different pieces of machin-

ery with different problems that led to different failures.

The rotary unions were different in terms of physical design and construction. The *Milliken* Series 9000 rotary union had a threaded, 1½ inch connection and weighed 16 pounds. It was made of cast iron, had a threaded locking-ring closure, and a single graphite bearing. It had no lubrication or cooling system and no external lubrication ports. It was a new product when purchased in 1993. In contrast, the *Sappi* Series 2500 rotary union had a flanged, 5 inch connection and weighed 468 pounds. It was made of welded steel, had a bolted flange closure, and dual metal roller bearings. It had a grease injection lubrication system, an air cooling system, and one external lubrication port. It was a refurbished product when purchased in 1999.

The rotary unions were different in terms of how and for what purposes they were designed to operate. The *Milliken* rotary union employed a single flow system in which oil flowed into the roll only, with a separate rotary union on either end of the roll. The external housing remained stationary while the internal shaft rotated. The *Milliken* rotary union used Therminol 55 oil at a temperature of 390 degrees, and had a roll speed of 10–12 rpm. It was attached to a roll that supplied adhesive to carpet intermediaries. The *Sappi* rotary union employed a double flow system incorporating a syphon tube which allowed oil to flow into the roll and then out of the roll through the same rotary union. The external housing rotated while the internal shaft remained stationary. The *Sappi* rotary union used Mobiltherm 603 oil at a temperature of 200 degrees, and had a roll speed of 205 rpm. It was attached to a calendar roll in a fine paper mill. Although both rotary unions shared the characteristic of enabling hot

oil to pass between stationary and rotating components, they did so in substantially different ways and for different reasons.

The rotary unions differed in terms of the alleged design and manufacturing defects that led to the respective failures. The allegedly defective parts in the *Milliken* rotary union were not present in the *Sappi* rotary union, and the allegedly defective parts in the *Sappi* rotary union were not present in the *Milliken* rotary union. The *Milliken* rotary union was allegedly defective because it used three defective single set screws which failed to hold the thrust collar in place on the internal shaft. It was missing a set screw which had the function of locking in place the external locknut. The locknut contained improperly designed threads which contributed to the locknut unscrewing itself from the housing, which allowed the hot oil to escape. The housing had four drain holes or slots which permitted hot oil to escape. The *Sappi* rotary union did not have the set screws and locknut as part of its design and the housing did not contain any drain holes. Plaintiffs allege the *Sappi* rotary union was defective because it lacked a second independent grease port and corresponding internal path, and because a missing plug in the air cooling line allowed communication between the grease and air systems, which further disrupted grease supply to the affected bearing. Because of these differences, evidence proving the defects alleged in the *Milliken* matter does not prove the defects alleged in the *Sappi* matter.

The rotary unions allegedly failed in different ways. The *Milliken* rotary union allegedly failed when the thrust collar loosened and moved on the shaft, leading to bellows compression and consequent seal failure. The resulting oil leakage path allowed oil to "coke" around the graphite bearing/shaft interface, causing a lock-up which in turn caused the locking ring to unscrew. That lead to atomization of oil through the drain holes in the housing. This mist of hot oil droplets allegedly evaporated and formed a flammable vapor cloud which migrated to a remote ignition source, causing the fire. The failure leading to the leakage was wholly within the rotary union. The *Sappi* rotary union allegedly failed when a lack of lubrication at the inboard bearing caused the bearing to overheat and seize, which locked the stationary shaft to the rotating body, causing the shaft to rotate and rupturing the flexible hot oil hose connected to it. The alleged failure leading to the oil leakage was external to the union, as the internal seal did not fail. The overheated rotary union allegedly ignited the oil running through it.

The *Milliken* and *Sappi* fires differ in terms of their extent and the damage they allegedly caused. In *Milliken,* the fire began in a large pool of hot oil. The flames reached the roof of the facility, causing the roof to collapse, which disabled the sprinkler system and enabled the fire to spread throughout the 750,000 square foot plant, completely destroying the facility and interrupting carpet production and sales for over one year, thereby causing claimed damages exceeding $1 billion. In Sappi, the fire was smaller, and a functioning sprinkler system limited the fire to its area of origin and an adjacent room. The fire damaged a paper making machine and the adjacent room, interrupting paper production for one month and allegedly causing $35 million in damages.

## B. Substantial Relationship—Legal Issues

■ In asserting a substantial relationship between the *Milliken* and *Sappi* matters, Defendant contends not only that the matters involve factually similar rotary unions, but also that they implicate similar legal theories and evidence. Both parties

again offer extensive exhibits, including the affidavits of legal ethics experts, all of which the Court has examined in detail. As with the factual matters, the Court acknowledges a degree of similarity among the lawsuits from the standpoint of legal issues. Nevertheless, the similarities do not in the Court's view suffice to render the matters substantially related.

At first glance, the complaints RKMC filed in the *Milliken* and *Sappi* matters and the legal theories on which they rely look rather similar. Both set forth claims of negligence, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose. The claims in both complaints encompass the same material elements of proof. In addition, both complaints are based on theories of design, quality assurance, and manufacturing defects. These surface similarities, however, should not be accorded too much weight, as they belie the substantial factual differences the Court has pointed out between the *Milliken* and *Sappi* rotary unions and the circumstances giving rise to the fires they allegedly caused. Simply put, although the rotary unions share a common manufacturer and generic purpose, the lawsuits involve two different substantially different products, two substantially different fires, and two substantially different lawsuits. The similarity of the complaints at a high level of generality does little to suggest a different conclusion.

During the course of discovery in the *Sappi* matter, it may well be that Plaintiffs will interview some of the same Duff–Norton witnesses and review some of the same Duff–Norton documents as were interviewed and reviewed in the *Milliken* matter. Some of the same Duff–Norton policies, practices, and procedures may be implicated as well. To be sure, the *Milliken* and *Sappi* rotary unions were designed, manufactured, tested, and sold by the same company. Given all this, it cannot be denied that there is some relationship among the matters. But that is not enough to make the two lawsuits substantially related. The design and manufacturing defects alleged in the two matters are wholly dissimilar; proving one does not prove the other. The mode and manner of product failure, ignition source, fire spread, and damages do not overlap. The physical evidence from each fire is completely different. These basic differences in operative facts obviate the similarities in legal theories.

## IV. CONCLUSION

For the reasons stated above, the Court finds that the *Milliken* and *Sappi* matters are not substantially related pursuant to MRPC 1.9. Accordingly, it is not necessary for the Court to examine the other issues Defendant raises in its motion for disqualification. Defendant's motion will be denied.

An Order consistent with this Opinion will be entered.