**In Re: GABAPENTIN PATENT LITIGATION**

Nos. MDL No. 1384, 00–2931(JCL), 00–2931, 00–3522, 00–4168, 00–4589, 00–6073, 01–0193, 01–0611, 01–1537, 01–2194, 03–1545, 03–1824, 03–4017, 04–2859, 04–4789.

United States District Court,
D. New Jersey.

Dec. 27, 2005.

John J. Francis, Jr., Drinker Biddle & Shanley LLP, Florham Park, for Pfizer Inc., Warner–Lambert Co., and Gödecke AG.

Edgar H. Haug, Steven M. Amundson, Frommer Lawrence & Haug LLP, New York, NY, Arnold B. Calmann, Saiber Schlesinger Satz & Goldstein, LLC, Newark, for Purepac Pharmaceutical Co. and Faulding, Inc.

William A. Rakoczy, Paul J. Molino, Rakoczy Molino Mazzochi & Siwik LLP, Chi-cago, IL, Joseph J. Fleischman, Norris, McLaughlin & Marcus, PA, Somerville, for Apotex Corp., Apotex, Inc., and TorPharm, Inc.

Thomas J. Meloro, Steven J. Lee, Ph.D., Kenyon & Kenyon, New York, NY, Allyn Z. Lite, Michael E. Patunas, Lite DePalma Greenberg & Rivas, LLC, Newark, for Teva Pharmaceuticals Industries, Ltd, and Teva Pharmaceuticals USA.

William L. Mentlik, Lerner David Littenberg Krumholz & Mentlik, Westfield, James E. Cecchi, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, P.C., Roseland, for Zenith Laboratories, Inc., Zenith Goldline Pharmaceuticals, Inc., and Ivax Corp.

Stanley H. Lieberstein, Richard J. Basile, St. Onge Steward Johnston & Reens LLC, Stamford, CT, Donald Horowitz, The Law Offices of Donald Horowitz, Hackensack, for Eon Labs Manufacturing, Inc.

## MEMORANDUM AND ORDER

LIFLAND, Senior District Judge.

Before the Court is First–Wave Defendants'[1] Motion to Bar Kaye Scholer LLP From Appearing as Attorneys for Plaintiffs. For the reasons set forth below, First–Wave Defendants' motion is granted.

## BACKGROUND

This motion to bar the law firm of Kaye Scholer from appearing on behalf of plaintiffs in this multidistrict patent infringement action (the "Gabapentin action") stems from the side-switching activities of two current Kaye Scholer attorneys, Scott G. Lindvall and Patricia J. Clarke, formerly of Darby & Darby ("Darby"). At the

1. First–Wave Defendants include Purepac Pharmaceutical Co. and Faulding Inc. (collectively "Purepac"), Teva Pharmaceuticals USA and Teva Pharmaceuticals Ltd. (collectively "Teva"), Zenith Laboratories, Inc., Zenith Goldline Pharmaceuticals, Inc., and IVAX Corporation (collectively "Ivax"), Eon Labs Manufacturing ("Eon"), and Apotex Corporation, Apotex Inc., and Torpharm Inc. (collectively "Apotex").

time of their association with Darby, Mr. Lindvall and Ms. Clarke were primarily responsible for the representation of Defendant Ivax Corporation ("Ivax") in the Gabapentin action.

In February 2001, the Judicial Panel on Multidistrict Litigation issued an Order consolidating the patent infringement litigations against the First–Wave Defendants before this Court. Shortly thereafter, the First–Wave Defendants entered into a written Joint Defense and Confidentiality Agreement ("JDA") which recognized, *inter alia,* that the sharing of confidential information, including attorney work-product, would be in the best interests of all defendants to efficiently manage the defense of this litigation. Mr. Lindvall, then a partner at Darby & Darby, executed the JDA on behalf of Ivax.

Mr. Lindvall and Ms. Clarke, Senior Counsel to Darby, were involved in the defense of the Gabapentin action. According to Ivax and the other First–Wave Defendants, Mr. Lindvall and Ms. Clarke were privy to confidential attorney work-product and privileged information relating not only to Ivax, but to all First–Wave Defendants: Mr. Lindvall and Ms. Clarke established and executed defense strategy; collected both testimonial and documentary evidence from Ivax's employees and files; and analyzed legal issues in preparation for summary judgment motions. They also participated regularly in joint defense meetings and conference calls where counsel for all First–Wave Defendants freely discussed their strategies for conducting the litigation, including formulating invalidity and noninfringement defenses and discovery strategies, evaluating expert reports, and drafting First–Wave Defendants' joint statement of facts and motions regarding the production of documents from Warner–Lambert's privilege log. (Declaration of Steven D. Rubin,

Esq., ¶ 4; Declaration of Steven M. Amundson, Esq., ¶ 11; Declaration of Paul J. Molino, Esq., ¶ 8; Declaration of Stanley H. Lieberstein, Esq., ¶ 10) Neither Pfizer, Kaye Scholer, nor Mr. Lindvall and Ms. Clarke dispute that Mr. Lindvall and Ms. Clarke were fully engaged in and primarily responsible for the pretrial representation of Ivax, and in the course thereof, were privy to confidential attorney work-product and privileged information relating to all First–Wave Defendants.

Darby's representation of Ivax ceased in June 2003. In March 2005, Mr. Lindvall sought to join Kaye Scholer as a partner. Mr. Lindvall recommended to Kaye Scholer that the firm also hire Ms. Clarke. Kaye Scholer, at the time, did not represent Pfizer in the Gabapentin action, but did represent Pfizer in *In re Neurontin Antitrust Litigation,* 217 F.Supp.2d 1380, pending in this Court. Kaye Scholer was aware of the possibility that Pfizer might ask the firm to represent it in the Gabapentin action. (Sherman Decl. ¶ 2)

During the course of Kaye Scholer's evaluation of Mr. Lindvall's and Ms. Clarke's candidacies, it became known that they had previously represented Ivax in the Gabapentin action on behalf of Darby. Accordingly, Mr. Lindvall was advised that any partnership offer was contingent upon Kaye Scholer obtaining appropriate waivers by Ivax of any conflict arising out of Kaye Scholer's representation of Pfizer in both the Neurontin matter and the Gabapentin action. Ms. Clarke was similarly informed that a job offer depended on Ivax executing a waiver. (Sherman Decl. ¶ 4)

In seeking to obtain these waivers, Milton Sherman, Esq., partner and co-chair of the Patent Group at Kaye Scholer, contacted William Mentlik, Esq., Ivax's outside counsel. Mr. Sherman explained that Kaye Scholer wanted to add Mr. Lindvall as a partner, subject to an appropriate

ethical screen. Mr. Sherman asked if Ivax would be willing to waive any right to assert a conflict of interest against Kaye Scholer based on Mr. Lindvall joining the firm, with appropriate screening. Mr. Mentlik agreed to discuss the matter with Ivax's general counsel, Steven D. Rubin, Esq., and indicated that he would recommend that Ivax agree to the request for a waiver. (Sherman Decl. ¶ 5) A similar discussion regarding Ms. Clarke took place several weeks later.

By letter dated April 14, 2005, Mr. Sherman proposed the following arrangement:

Mr. Lindvall, after joining Kaye Scholer, will not work on either the Neurontin or the Gabapentin Matter, any of the individual actions included within those matters, or any FDA issue relating to Neurontin or gabapentin. In addition, Kaye Scholer will create an ethical screen between Mr. Lindvall and the Kaye Scholer attorneys and personnel representing Pfizer in both the Neurontin and Gabapentin Matters and any FDA issues relating to Neurontin and Gabapentin.

IVAX agrees that it waives any right to assert, in any context, that adding Mr. Lindvall as a partner of Kaye Scholer creates an ethical conflict, including, but not limited to, any right to seek to disqualify Kaye Scholer from serving as counsel of record for Pfizer in the Neurontin or Gabapentin Matter or in any of the individual actions included within those matters, or from serving as counsel to Pfizer in connection with any FDA issues relating to Neurontin or gabapentin.

(Sherman Decl. Ex. 1) Mr. Rubin accepted the terms of the proposed arrangement and agreed to the waiver. (*Id.*; Rubin Decl. Ex. A) Mr. Sherman subsequently sent a letter proposing the same waiver for Ms. Clarke, to which Mr. Rubin likewise agreed. (Sherman Decl. Ex.2; Rubin Decl. Ex. B) Neither Mr. Mentlik nor Mr. Rubin consulted or sought approval from the other First–Wave Defendants. (Amundson Decl. ¶ 15; Molino Decl. ¶ 10; Lieberstein Decl. ¶ 12) Furthermore, there is no evidence in the record that Kaye Scholer advised any of the other First–Wave Defendants of its request for a waiver from Ivax or sought any corresponding waiver from them.

Kaye Scholer admits that, at the time of these negotiations, it was aware of the possibility that Pfizer might ask the firm to represent it in the Gabapentin action. (Sherman Decl. ¶ 2) So was Ivax, though Mr. Rubin now contends that when the waivers were executed, he was not informed, nor was it contemplated (presumably he means by Mr. Rubin himself) that Kaye Scholer would later seek to be substituted as lead counsel in this matter for the Fitzpatrick Cella firm. (Rubin Decl. ¶ 7) The terms of the proposed waiver agreement clearly and unambiguously indicate that Kaye Scholer's participation in the Gabapentin action is contemplated. By agreeing to the waiver, which specifically covers waiving the right to seek to disqualify Kaye Scholer from serving as lead counsel to Pfizer in the Gabapentin matter, Ivax and Mr. Rubin must have contemplated that ultimate occurrence.

Mr. Rubin did not consider the implications that Ivax's waiver would have for the co-defendants, whose rights might be impacted by Mr. Lindvall's and Ms. Clarke's prior representation of Ivax. (*Id.*)

Mr. Lindvall started at Kaye Scholer on April 27, 2005. On that same day, Kaye Scholer's Professional Ethics Committee distributed a memorandum (the "Screen Memo") which stated, in pertinent part, that while Mr. Lindvall was at "Darby, and until August 19, 2002, Scott represented Ivax in patent infringement litigations re-

lated to Neurontin. In accordance with a waiver agreement we have obtained from Ivax, Scott will be screened from Kaye Scholer's representation of Pfizer in the Neurontin Matters." (Sherman Decl. Ex. 3) A similar Screen Memo was sent on behalf of Ms. Clarke on her first day with Kaye Scholer. (Sherman Decl. Ex. 4) There is no dispute that Kaye Scholer has effectively screened Mr. Lindvall and Ms. Clarke from both the Neurontin and Gabapentin matters.

On September 9, 2005, Pfizer informed the Court that it intended to file a substitution of attorney, replacing Fitzpatrick Cella with Kaye Scholer as attorneys for Plaintiffs in the Gabapentin action. This motion ensued.

**ANALYSIS**

This motion presents two distinct issues. The first is whether the personal disqualification of Mr. Lindvall and Ms. Clarke (attributable to their side-switching) can be imputed to the entire Kaye Scholer firm, and if so, whether Ivax's agreement to waive any right to assert a conflict of interest is valid and enforceable. The second issue is whether the other parties to the JDA have a right to assert a disqualifying conflict of interest based on an implied attorney-client relationship or other fiduciary relationship formed by virtue of their joint association in the defense consortium.

I. *Waiver of Imputed Disqualification*

■ Without question Mr. Lindvall and Ms. Clarke are personally disqualified from representing Pfizer, pursuant to Rule of Professional Conduct ("RPC") 1.9. Consent by a client will not cure the conflict when an attorney with primary responsibility for a matter switches to a firm on the opposing side of the matter. *See* Kevin H. Michels, New Jersey Attorney Ethics 578 (2005). This does not end the

inquiry though, because the issue here is whether Mr. Lindvall's and Ms. Clarke's personal disqualifications are imputed to the entire Kaye Scholer firm.

■ The imputation of ethical conflicts is covered by RPC 1.10. Rule 1.10(c) and (d) are applicable to the present situation. Rule 1.10(c) states:

When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under RPC 1.9 unless:

(1) the matter does not involve a proceeding in which the personally disqualified lawyer had primary responsibility;

(2) the personally disqualified lawyer is timely screened from any participation in the matter and apportioned no part of the fee therefrom; and

(3) written notice is promptly given to any affected former client to enable it to ascertain compliance with the provisions of this Rule.

However, "[a] disqualification prescribed by this rule may be waived by the affected client under the conditions stated in RPC 1.7." RPC 1.10(d). The conditions most pertinent to an effective waiver require that "*each affected client* gives informed consent, confirmed in writing, after full disclosure and consultation ...." RPC 1.7(b)(1) (emphasis added).

■ It is clear to the Court that under RPC 1.10(c)(1), Mr. Lindvall's and Ms. Clarke's personal disqualifications are imputed to Kaye Scholer, because the matter in question here, the Gabapentin action, is one in which both attorneys had primary responsibility while acting as counsel to Ivax. Screening and notice alone would not be sufficient to prevent Kaye Scholer from being disqualified by the ethical conflict of interest surrounding Mr. Lindvall and Ms. Clarke. But, as RPC 1.10(d) indicates, a

disqualification prescribed by this rule may be waived. The question therefore becomes whether Ivax's waiver, permitting Kaye Scholer to avoid imputed disqualification by obtaining the consent of each "affected client," meets the conditions established in RPC 1.7; namely, that the consent was "informed" and given after "full disclosure and consultation."

The text of RPC 1.7 explicitly requires consent after "full disclosure." At its core, the concept of informed consent depends upon the communication of "adequate information and explanation about the material risks of . . . the proposed course of conduct." RPC 1.0(e). A precise definition of "informed consent" and "full disclosure" is difficult, necessitating a case-by-case factual analysis. *In re Lanza*, 65 N.J. 347, 352, 322 A.2d 445 (1974) (stating that the extent of the necessary disclosure "is a question that must be conscientiously resolved by each attorney in light of the particular facts and circumstances that a given case presents").

Kaye Scholer's letter clearly informed Ivax that it might represent Pfizer in the Gabapentin matter, and Ivax was represented by sophisticated counsel in reaching its decision to consent. The Court concludes that Ivax's consent to the waiver was informed after full disclosure. If Ivax were the only "affected client" (RPC 1.7(b)(1)) from whom consent was needed, Kaye Scholer would be permitted to represent Pfizer and the inquiry would end here.

## II. *The Co–Defendants' Right to Seek Disqualification as "Affected Clients"*

 The First–Wave Defendants argue that, based on the JDA and their actions pursuant thereto, disqualification of Kaye Scholer is still required because, unlike Ivax, they did not consent to waive the right to assert this conflict of interest. Neither Kaye Scholer nor Mr. Lindvall and Ms. Clarke dispute that Mr. Lindvall and Ms. Clarke acquired knowledge of the co-defendants' confidential information when participating in joint defense meetings. Rather, Kaye Scholer argues that it owes its ethical obligations only to Ivax because only Ivax was Mr. Lindvall's and Ms. Clarke's former client; that Ivax waived its right to object to Kaye Scholer's representation of Pfizer; and that its ethical screen, the efficacy of which is unchallenged, is sufficient to protect the co-defendants' confidences. The necessary import of Kaye Scholer's position is that Ivax, as one party to a joint defense agreement, can unilaterally waive the right to object to a conflict of interest for all other parties to the same agreement, as long as a screen is in place to protect the co-defendants' confidences. In assessing this position, the Court must consider whether the JDA (and actions taken pursuant thereto) created a fiduciary relationship or implied attorney-client relationship among all the parties thereto and their respective counsel, thus placing the co-defendants in a position to seek disqualification of Kaye Scholer.

In *Essex Chemical Corp. v. Hartford Accident & Indem.*, 993 F.Supp. 241 (D.N.J.1998), this Court recognized that counsel working together within a defense consortium and sharing otherwise privileged information of their respective clients could create implied attorney-client or fiduciary obligations under certain circumstances. *Id.* at 252. Those circumstances include whether confidential information was actually exchanged and the precise nature of the relationship among all defense counsel.[2] *Id.* Other courts have

---

**2.** In *Essex Chemical,* the record was sparse, whereas here there is no dispute as to the circumstances.

addressed the issue of whether defendants who are engaged in a joint defense can assert rights to disqualify the side-switching attorney of a co-defendant. *Wilson P. Abraham Const. Corp. v. Armco Steel Corp.,* 559 F.2d 250 (5th Cir.1977); *City of Kalamazoo v. Michigan Disposal Serv. Corp.,* 125 F.Supp.2d 219 (W.D.Mich.2000); *GTE North, Inc. v. Apache Products Co.,* 914 F.Supp. 1575 (N.D.Ill.1996).

In *Wilson P. Abraham, supra,* Stephen D. Susman, Esq. represented one of several defendants in a civil suit that arose out of a grand jury indictment in Texas on charges of conspiracy and antitrust violations in the steel industry. *Id.* at 251. Thereafter, a second civil suit was filed against the same defendants based upon a second grand jury indictment in Louisiana that charged the defendants with bid-rigging and conspiracy. *Id.* at 252. In this second civil suit, the plaintiff's attorney sought to engage Mr. Susman as co-counsel. As a result of this attempt by Mr. Susman to switch sides, the co-defendants of Mr. Susman's former client endeavored to disqualify him. *Id.* at 253.

Discussing the sharing of confidences in a joint defense situation, the court stated that

> an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants. Just as an attorney would not be allowed to proceed against his former client in a cause of action substantially related to the matters in which he previously represented that client, an attorney should also not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information took place between the various co-defendants in preparation of a joint defense.

*Id.*

The *Wilson P. Abraham* court recognized that a fiduciary relationship could arise between Mr. Susman and the co-defendants, but could not resolve the controversy between the parties because counsel hotly disputed what information was exchanged among the co-defendants. *Id.* As there was no direct attorney client relationship between the parties, the court would not presume an exchange of confidential information and therefore remanded to the trial judge to determine whether Mr. Susman was actually privy to confidential information. *Id.*

In the present case, an examination of the detailed affidavits submitted by counsel for the First–Wave Defendants indicates that confidential and privileged information and attorney work-product were actually shared by them and Mr. Lindvall and Ms. Clarke. See *supra* at 609. As indicated above, Kaye Scholer and Mr. Lindvall and Ms. Clarke do not dispute that Mr. Lindvall and Ms. Clarke were privy to confidential information—rather, Kaye Scholer contends that its screen is sufficient to protect whatever confidential information Mr. Lindvall and Ms. Clarke received as part of the defense consortium.

An examination of the terms of the JDA reveals a clear intent that any voluntarily-shared information would remain confidential and be protected by the attorney-client privilege. For example, the JDA states that the signatories are required to "take all steps necessary to maintain the privileged and confidential nature of the infor-

mation." The terms of the JDA and the undisputed performance thereunder are sufficient for the Court to conclude that an implied attorney-client relationship arose between Mr. Lindvall and Ms. Clarke, as counsel for Ivax, and the other First–Wave Defendants, by virtue of their joint participation in the defense of the Gabapentin matter.

The *Wilson P. Abraham* decision does not address the issue of imputing to Kaye Scholer Mr. Lindvall's and Ms. Clarke's implied attorney-client relationship with the other First–Wave Defendants. *Wilson P. Abraham*, 559 F.2d at 252 (although Mr. Susman was engaged as co-counsel, only Mr. Susman's personal disqualification was at issue).

In *GTE North*, the U.S. Environmental Protection Agency gave GTE North, Inc. ("GTE"), Chrysler Corporation ("Chrysler") and other companies notification of Potentially Responsible Party ("PRP") status, resulting from the cleanup of a Superfund site. *GTE North*, 914 F.Supp. at 1577. In this regard, GTE was represented by Hinshaw & Culbertson. *Id.* at 1578. Chrysler was represented by Jon S. Faletto, Esq., of the law firm of Howard & Howard. *Id.* Together five PRPs, including GTE and Chrysler, formed the Appleton Road Committee and executed the Appleton Agreement. *Id.* at 1577. The purposes of the Appleton Agreement were to allocate each member's share of the response cost, to cooperate in investigating and identifying additional PRPs and to pursue cost-recovery activities against any additional PRPs. *Id.* The Appleton Agreement provided that all shared information between members and their counsel "shall be held in strict confidence by the receiving member and by all persons to whom such confidential information was revealed by the receiving member." *Id.* The agreement also provided

that disclosure of such confidential information to members and their counsel would not constitute waiver of the attorney-client or work-product privileges. *Id.* The members of the Appleton Committee who had elected to pursue cost recovery, including Chrysler and GTE, entered into a separate Investigation Agreement implementing a joint investigation of additional PRPs who had not participated in the cleanup of the landfill. *Id.* at 1578. Like the Appleton Agreement, the Investigation Agreement contained several confidentiality provisions. *Id.*

Counsel for each member (including Mr. Faletto) met on several occasions to discuss strategy for conducting the investigation, the investigation results themselves, the relative merit of proceeding against certain defendants, and the legal strategy for bringing the cost recovery action. *Id.* GTE ultimately filed a CERCLA cost recovery action against Apache Products Company, Dean Foods and others. *Id.* Attorney Faletto of Howard & Howard (who had represented Chrysler under the Appleton Agreement and the Investigation Agreement) appeared on behalf of Dean Foods to defend it in the cost recovery action. *Id.* GTE moved to disqualify Mr. Faletto and his law firm on the basis of imputed disqualification, arguing that an implied attorney-client relationship arose from GTE's and Chrysler's joint membership in the Appleton Road Committee. Much like the present case, Howard & Howard had fully disclosed to Chrysler its intention to represent Dean Foods and had obtained Chrysler's consent to do so.

The court granted GTE's motion to disqualify Mr. Faletto and Howard & Howard, reasoning that "the disclosures by GTE via its counsel to Faletto, Chrysler's counsel, were made with the expectation that they would not be disclosed to the targets of the investigation. Faletto's re-

ceipt of such disclosures and participation in meetings obligated him to refrain from appearing on the opposite side of the same litigation to which such information would be highly pertinent." *Id.* at 1581. The court concluded that a fiduciary relationship arose between GTE and Mr. Faletto. In essence, because of their involvement during the joint pre-suit investigation, GTE became Mr. Faletto's "former client" for the purposes of disqualification under Rule 1.9.

To arrive at this conclusion, the *GTE North* court performed the same analysis as did the *Wilson P. Abraham* court and as envisioned by the remand in *Essex Chemical.* First, the court examined whether confidential information was actually exchanged between GTE and Chrysler and their respective counsel, and then considered the circumstances under which any such exchanges occurred. The latter entailed examining the confidentiality provisions in the two Agreements. *Id.* at 1580. As in the instant case, it was undisputed that counsel for all members jointly discussed their investigation results, as well as the strategy and legal merits of further civil prosecution. *Id.* at 1581. Likewise, the confidentiality provisions clearly established the intent that shared information would remain confidential and protected under the attorney-client privilege. The *GTE North* court concluded that Mr. Faletto was privy to confidential information which obligated him to refrain from appearing as Dean Foods' counsel.[3]

For the same reasons, this Court has concluded that Mr. Lindvall and Ms.

Clarke have a fiduciary and implied attorney-client relationship with all of the First–Wave Defendants.

The next issue that must be determined is whether the First–Wave Defendants, all of whom are, by implication, Mr. Lindvall's and Ms. Clarke's "former clients," can assert a conflict of interest to disqualify not only Mr. Lindvall and Ms. Clarke, but also Kaye Scholer.[4]

Although there is no reason to doubt the efficacy of Kaye Scholer's screen or the integrity of Kaye Scholer, Mr. Lindvall and Ms. Clarke in complying with that screen, screening in this circumstance is insufficient. It is undisputed that Mr. Lindvall and Ms. Clarke had primary responsibility for Ivax's defense in the same matter (the Gabapentin action) in which Kaye Scholer now seeks to represent plaintiff Pfizer. As counsel for Ivax, they were privy to actual confidences of the other First–Wave Defendants. Out of these circumstances arose a fiduciary and implied attorney-client relationship between Mr. Lindvall and Ms. Clarke and the other First–Wave Defendants. The Court concludes that these relationships must be imputed to Kaye Scholer as well. Rule 1.10(c) clearly so states:

> When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under RPC 1.9.

The exceptions in RPC 1.10(c)(2) and (3) for screening and notice are not enough to avoid imputation to Kaye Scholer of Mr.

---

**3.** *City of Kalamazoo v. Michigan Disposal Serv. Corp.,* 125 F.Supp.2d 219 (W.D.Mich. 2000), cited earlier in this Memorandum, discusses *GTE North* and holds that "an attorney in a joint defense situation may find an attorney-client relationship arise with co-defendants as the result of sharing confidential information." *Id.* at 235.

**4.** This precise issue was not addressed in *GTE North.* In that case, both the attorney and his firm switched sides in seeking to represent Dean Foods. Thus, this Court must look to the RPCs to resolve the matter at hand.

Lindvall's and Ms. Clarke's disqualification because the exception in RPC 1.10(c)(1) cannot be met—this is the same proceeding in which they formerly had primary responsibility for the representation of Ivax. Imputation is required unless all three exceptions (RPC 1.10(c)(1), (2), and (3)) are met. Had Kaye Scholer received a waiver from the other First–Wave Defendants, pursuant to 1.10(d), this attempt to disqualify it would fail. But, because Kaye Scholer did not receive a waiver from the other First–Wave Defendants, the First–Wave Defendants' motion must be granted.

Accordingly, **IT IS** on this 22nd day of December 2005,

**ORDERED** that the Motion to Bar Kaye Scholer LLP From Appearing as Attorney for Plaintiffs in *In re Gabapentin Patent Litigation*, MDL No. 1384, Master Docket No.: 00–2931 (encompassing Civil Action Nos.: 00–2931, 00–3522, 00–4168, 00–4589, 00–6073, 01–0193, 01–0611, 01–1537, 01–2194, 03–1545, 03–1824, 03–4017, 04–2859, 04–4789) is granted.